**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE LIBERTY TAX, INC. SECURITIES LITIGATION | ) ) ) ) | Case No. 2:17-CV-07327-NGG-RML |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.     NATURE OF ACTION ................................................................................. 1

II.    JURISDICTION AND VENUE ..................................................................... 7

III.   PARTIES ...................................................................................................... 8

IV.    CONFIDENTIAL WITNESSES ................................................................. 11

V.     SUBSTANTIVE ALLEGATIONS ............................................................. 11

    A.     Background ....................................................................................... 11

    B.     The Skadden Report ......................................................................... 13

    C.     Hewitt Treated the Company as his "Playground" .......................... 14

       1)   "John Hires" ................................................................................ 16

       2)   Fraudulent Franchise Sales and Loans ...................................... 17

       3)   Hewitt's Sexual Activity in the Office and Resulting Litigation ................... 18

       4)   Hewitt's Use of Corporate Funds for His Lavish Vacations .......................... 20

       5)   La Bella Italia ............................................................................. 21

       6)   Hewitt's Behavior Created a Hostile Work Environment that Devastated Company Morale and Resulted in High Employee Turnover and Risk ......... 22

    D.     Hewitt's Firing and Aftermath ......................................................... 24

    E.     False and Misleading Statements and Omissions ............................ 27

       1)   2013 ............................................................................................ 28

       2)   2014 ............................................................................................ 30

       3)   2015 ............................................................................................ 35

       4)   2016 ............................................................................................ 41

       5)   2017 ............................................................................................ 53

    F.     Applicable SEC Regulations ............................................................ 62

       1)   Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ................ 62

       2)   Item 402 of SEC Regulation S-K, 17 C.F.R. § 229.402 ................ 63

    G.     The Truth Begins to Emerge ............................................................ 64

    H.     Post-Class Period Developments ..................................................... 78

    I.     Additional Scienter Allegations ....................................................... 80

VI.    CLASS ACTION ALLEGATIONS ............................................................. 82

VII.   LOSS CAUSATION AND ECONOMIC LOSS .......................................... 83

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* ALLEGATIONS ............................ 85

IX.    NO SAFE HARBOR .................................................................................... 85

X.      CAUSES OF ACTION .................................................................................................. 87

XI.     JURY TRIAL DEMAND ............................................................................................. 89

XII.    PRAYER FOR RELIEF ............................................................................................... 89

Lead Plaintiff IBEW Local 98 Pension Fund ("Lead Plaintiff"), through its undersigned attorneys, makes the following allegations against Liberty Tax, Inc. ("Liberty Tax" or the "Company"), John T. Hewitt ("Hewitt"), the Company's former Chief Executive Officer ("CEO") and current Chairman of the Board, and Kathleen E. Donovan ("Donovan"), the Company's Chief Financial Officer ("CFO") (Donovan and Hewitt are the "Individual Defendants," and, together with Liberty Tax, "Defendants"), based on its personal knowledge, on information and belief, and on the investigation of Lead Plaintiff's counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by the Company, records of judicial proceedings in the United States District Court for the Eastern District of New York, regulatory filings and reports, press releases, public statements, interviews with former employees of Liberty Tax (referred to herein as "Confidential Witnesses" or "CWs"), news articles, other publications, securities analysts' reports and advisories about Liberty Tax, and other readily obtainable information.  Local 98 believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF ACTION

1.      This is a securities class action on behalf of purchasers of Liberty Tax securities during the period between October 1, 2013 through and including February 23, 2018 (the "Class Period") that seeks to recover damages caused by Defendants' violations of federal securities laws pursuant to remedies under the Securities Exchange Act of 1934 ("Exchange Act").  Throughout the Class Period, Defendants made a series of false and misleading statements and omissions of material fact concerning the effectiveness of the Company's internal controls and its active efforts to root out fraud and other misconduct so as to conceal from investors the Company's ongoing funding of Defendant John Hewitt's reckless conduct that placed the Company at risk, permitted

the loss of millions of dollars of Company funds, and created a detrimental "Tone at the Top" and hostile work environment that reduced productivity and weakened the Company's financial condition.  Defendants further misled investors by warning that Hewitt's interests and actions "may" be adverse to shareholders, while knowing full well that, in fact, Hewitt's interests and actions were actively and severely damaging to shareholder interests.

2.     As explained in detail below, Hewitt, as the CEO and Chairman who was the sole holder of Class B voting stock, treated the Company as his "playground," with the Company knowingly condoning and footing the bill for his reckless escapades that included dating countless employees; routinely having sex with employees in his office; using Company resources to further his romantic relationships by, among other things, directing the Company to hire countless of his girlfriends' friends and relatives to "made up" positions for which they were nevertheless unqualified, causing the Company to often exceed its annual "new hire" budget by at least $1 million; billing the Company for lavish vacations with his girlfriends at least every other weekend; and creating a hostile work environment which exposed the Company to significant financial risk and liability, including a $500,000 payment to settle employees' hostile work environment charges.

3.     The Company permitted Hewitt to sap *millions* of dollars from Company coffers, all unbeknownst to shareholders.  The Company's business model is premised upon selling franchises throughout the country to expand its markets and drive revenue.  Defendants, however, purposefully took a loss on at least one franchise just so Hewitt's girlfriend could purchase it for no money down, and then Hewitt later forced the Company to repurchase the very same franchise at a drastically inflated value plus hundreds of thousands of dollars in cash and stock.  Hewitt had the Company extend one of his girlfriends a Company loan which a Company employee had

previously denied her.  Hewitt also directed Company funds to his unrelated business, La Bella Italia, an Italian restaurant, which he used a Company employee to run for him and where he charged the Company for open bar events.

4.     Hewitt's spending and general misconduct cost the Company millions of dollars and wreaked havoc on the Company's bottom line and overall performance.  Indeed, during the Class Period, and as a result of Hewitt's misconduct, the Company's financial performance suffered immensely, with annual net income never exceeding $21.98 million and dropping to as low as $8.69 million, and with other key metrics such as number of tax returns prepared and top-line revenue experiencing prolonged stagnation or decline as well, all of which led to a steady stream of stock-price declines, as discussed in more detail below.

5.     By 2017, the Board of Directors ("Board") must have recognized that millions of unreported dollars were benefiting Hewitt and the internal audits were nothing more than shams incapable of accurately reporting internal control deficiencies because Hewitt "ruled by fear" and created a hostile "Tone at the Top."  Finally, in response to a disturbing complaint of Hewitt's sexual activity in his office that was made to the Company's hotline in July 2017 that simply could not be ignored, the Audit Committee hired the law firm Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden") to investigate Hewitt.  Skadden ultimately concluded in a written report (the "Skadden Report") that the Company had a "good faith basis" to fire Hewitt "for cause" due to the misconduct detailed herein.  The Board, pursuant to Skadden's recommendation, removed Hewitt as CEO on September 5, 2017, but Defendants did not disclose to the market the true reason for the termination or the existence of the Skadden Report.  Rather, the Company issued a Form 8-K that falsely suggested Hewitt's departure was part of a "deliberate succession plan."

6.     Each Defendant actively concealed the foregoing from investors.  Defendant Donovan, for example, was "well in the know" regarding Hewitt's misconduct, and took it upon herself as CFO to conceal it, regularly "spinning [Hewitt's misconduct] for the Street," by which she meant Wall Street—*i.e.* investors—and the general public.  Donovan's "spin" is readily apparent in the false and misleading statements Defendants repeatedly made to investors in the quarterly periodic filings with the Securities Exchange Commission ("SEC") that she signed and/or participated in the preparation of during the Class Period.  For example, Defendants repeatedly assured investors that the Company's internal controls were effective, and that the Company was actively engaged in efforts to root out fraud and other misconduct, with Hewitt specifically stating that the Company's "compliance task force" was "taking appropriate action to ensure that the standards of the Liberty brand are upheld and that those who do not uphold Liberty standards are exited from the Liberty system."  Defendants also told investors Hewitt's interests and actions "may" be adverse to shareholders, while Defendants knew for a fact that for years Hewitt was engaged in the reckless conduct and fraud that was partially memorialized in the Skadden Report.

7.     Within two months of Hewitt's ouster, the Company was plunged into turmoil as Hewitt began to wield his Class B control and investors began to learn the scope of what Defendants concealed from them.

8.     On November 7, 2017, after the market closed, the Company abruptly announced the resignation of Defendant Donovan, without explanation, and despite the six-figure retention bonus the Company had offered her.  In response to this news, the Company's share price ***dropped 16.98%*** the next day, dropping from a close of $13.25 per share on November 7 to close at $11.00 per share on November 8.

9.     Two days later, on November 9, 2017, *The Virginian-Pilot* released a bombshell report titled "Ex-CEO of Liberty Tax likely had sex in his office and dated employees, report says" (the "November 9 Article"), containing salacious details from the Skadden Report, which had apparently been leaked.

10.     Within days of information from the Skadden Report becoming public on November 9, 2017, Hewitt exercised his Class B common stock rights to elect two new directors to the Board.  The same day the November 9 Article was published, Board member John Garel announced his resignation, stating that Hewitt's exercise of his power "has resulted in problems for the Company and disagreements on the Board."  The Company, however, did not disclose Garel's resignation until later.

11.     On December 11, 2017, before the market opened, the Company announced that its accounting firm, KPMG LLP ("KPMG"), resigned, causing the Company to delay filing its Quarterly Report on Form 10-Q.  Notably, the announcement stated that KPMG had expressed "concern that the actions of [Hewitt] . . . have created an ***inappropriate tone at the top*** which leads to ***ineffective entity level controls over the organization***."[1]  KPMG further revealed that Hewitt's "involvement in the Company's business and operations" caused it to question the reliability of "past" management representations:

> KPMG informed the Audit Committee and management that Mr. Hewitt's ***past and continued*** involvement in the Company's business and operations . . . has led it to ***no longer be able to rely on management's representations***, and therefore has caused KPMG to be unwilling to be associated with the Company's consolidated financial statements.

12.     In response to this partial corrective disclosure, the Company's share price on December 11, 2017 ***dropped 6.69%*** from the prior trading day's closing price.

---

[1] Unless otherwise indicated, all emphasis is added.

13.     Over the next two months, the Company announced the replacement of several senior executives and Board members.   On December 18, 2017, for instance, the Company announced the resignation of Board members Steven Ibbotson and John Garel, with the latter writing that "[t]he Class B Directors are acting in unison through Mr. Hewitt's Class B rights and are . . . unwilling to consider input that interferes with their objectives, with which I materially disagree."

14.     On February 19, 2018, after the market closed, Liberty Tax announced the appointment of director and Company franchisee, Nicole Ossenfort, as CEO, replacing Edward L. Brunot, who had been appointed by the Board after it ousted Hewitt.   The Company also announced the appointment of a new Chief Operating Officer and Chief Strategy Officer.   The next day, on February 20, 2018, the Company's *share price plunged 17.65%*, with media reactions noting that the Company had fired its second CEO in 6 months, that Ossenfort had been "handpicked" by Hewitt, and that Hewitt would be "serv[ing] in an advisory role and remain chairman of the board."   Analysts noted that the move "appears to be a continuation of the control that Chairman John Hewitt refuses to relinquish despite his firing as CEO," and it prompted Barrington Research to *downgrade Liberty Tax*.

15.     On February 21, 2018, the Company announced the resignation of its sole remaining Class A board member, Ross Longfeld, who stated in his resignation letter that "[t]he Tone at The Top issue [identified by KPMG] remains, and has greatly impeded the company in finding a national audit firm to accept an engagement, which is critical to our status as a publicly traded company."   Longfeld also noted:

> [I]t has quickly become apparent to me that the board and the new senior executives [appointed by Hewitt] are making it virtually impossible for the Chief Financial Officer and the General Counsel to do their jobs effectively, particularly as these three *new*

*executives are not qualified* to hold these positions in a public company and they are all
beholden to John Hewitt.

Longfeld's observation that Hewitt's hires were not qualified for their positions is a continuation
of Hewitt's practice of hiring his girlfriends' friends and relatives, the vast majority of whom were
completely unqualified.  In response to this news, on February 22, 2018, the Company's ***share
price dropped an additional 3.88%*** to close at $8.65 per share.

16.     Finally, on February 23, 2018, after the market closed, the Company filed a Form
8-K and issued a press release announcing the appointment of the new Chief Operating Officer,
Chief Strategy Officer, Ossenfort as CEO, a new Board member, and the termination of the
consulting agreement the Company had with Defendant Donovan (who had resigned in
November), as well as the departure of officers Vanessa M. Szajnoga, Vice President and General
Counsel, and Rich Artese, Chief Information Officer.  On this news, the next day Liberty Tax's
***share price dropped an additional 3.15%*** to close at $8.28 per share.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the
Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rules 10b-5, 14a-3, and 14a-9
promulgated thereunder by the SEC, 17 C.F.R. §§ 240.10b-5, 240.14a-3, 240.14a-9.

18.     This Court has jurisdiction over the subject matter of the federal securities claims
pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28
U.S.C. §1391(b) and (c) because one or more Defendants may be found or resides here or had
agents in this district, transacted or is licensed to transact business in this district through the
Company's 44 franchise locations within this district.

20.     In connection with the acts and conduct alleged in this Consolidated Amended Class Action Complaint ("Amended Complaint"), defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

21.     Lead Plaintiff Local 98 is a multi-employer defined benefit retirement plan for approximately 5,000 employees.  During the Class Period, Lead Plaintiff purchased 10,300 shares of Liberty Class A stock and lost more than $42,542 as a result of such purchases.[2]

22.     Defendant Liberty Tax is a publicly traded Delaware corporation headquartered in Virginia Beach, Virginia.  Liberty Tax is one of the leading providers of tax preparation services in the United States and Canada, primarily offering tax preparation services and products through franchised locations.  Liberty Tax is the holding company for JTH Tax, Inc. d/b/a Liberty Tax Service, its largest subsidiary, which was incorporated in Delaware in October 1996.  The Company has two classes of common stock, Class A common stock and Class B common stock.  Hewitt is the sole owner of Class B common stock which, pursuant to the Company's Certificate of Incorporation, permits Hewitt to elect a majority of the members of the Board.  Shares of Liberty Tax's Class A common stock trade on the Nasdaq stock exchange under the ticker "TAX."

23.     Defendant Hewitt founded the Company in 1996.  He served as CEO and President of the Company from October 1996 to September 2017, when a majority of the Company's Board of Directors voted to remove him as an officer following an investigation into his misconduct that

---

[2] While the Class Period in the Consolidated Amended Complaint is longer than that alleged in the original complaint (Dkt. No. 1), Lead Plaintiff has no additional trades during the Class Period other than those reported in Schedule A to the PSLRA Certification it filed on February 13, 2018 (Dkt. No. 17-2 at 4).

was conducted by independent counsel Skadden.  Hewitt has served as Chairman of the Board since October 1996.  From August 1982 to June 1996, Hewitt was the Founder, President, CEO and Chairman of Jackson Hewitt Inc.  Hewitt, as CEO of the Company, signed all of the Company's Forms 10-Ks for the fiscal years ended 2013, 2014, 2015, 2016, and 2017, and all of the Company's 10-Qs during his tenure as CEO.

24.   Defendant Donovan served as CFO of the Company from January 23, 2014 until her resignation from the Company on November 7, 2017.  Defendant Donovan signed all of the Company's Form 10-Ks for the fiscal years ended 2014, 2015, 2016, and 2017, and all of the Company's 10-Qs during her tenure as CFO.

25.   Because of the Individual Defendants' respective positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, internal audits, present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management, sales and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

26.   It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Liberty Tax's public filings, press releases and earnings calls, as alleged herein, are the collective actions of the narrowly defined group of defendants defined above as the Individual Defendants. Each of the Individual Defendants, as officers of Liberty Tax, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business and operations as alleged herein.

Each acted on behalf of the Company and the actions of each, as alleged herein, can be imputed to Liberty Tax.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, knew or recklessly disregarded that the false and misleading statements described herein were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the Nasdaq, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Liberty Tax's publicly-traded securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants would have each been provided with copies of the documents alleged herein to be misleading, including the Company's quarterly and annual filings and the prepared remarks for each of the Company's quarterly earnings conference calls, prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be

corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## IV.     CONFIDENTIAL WITNESSES

29.     **Confidential Witness 1 ("CW1")** worked at Liberty Tax from February 2007 until November 2012, beginning in sales support and ending as Executive Assistant to the Chief Information Officer.  In these roles, CW1's responsibilities included scheduling appointments, answering phones, and ordering supplies.  During this time period and for a few years after, CW1 had a personal relationship with Hewitt such that CW1 has personal knowledge of the various romantic relationships Hewitt had with then current and former female employees of the Company.

30.     **Confidential Witness 2 ("CW2")** worked at the Company's Virginia Beach, Virginia corporate headquarters from March 2014 until December 2015 as a Human Resources Manager in the Company's Human Resources ("HR") department.  CW2's responsibilities included recommending and implementing personnel policies and procedures, managing employee benefits, approving invoices, and annually re-evaluating policies for cost-effectiveness, as well as managing HR staff.  CW2 reported to Kelly McKinney, Vice President of Human Resources, and CW2 regularly interacted with Defendant Donovan and occasionally interacted with Hewitt.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

31.     Hewitt, who is 68 years old, has been in the tax preparation business for most of his life.  He got his start in 1969 when, while still a student at the University of Buffalo, he attended a tax-preparation course offered by H&R Block.  He then worked for H&R Block as a tax preparer,

and worked his way up the corporate ladder until he was ultimately running over 250 offices for the company.[3]

32.     Sensing a need for tax preparation software to make preparation more efficient, Hewitt pitched the idea to H&R Block.  When H&R Block rejected his idea, Hewitt resigned from the company, developed his own tax software with his father, and then founded Jackson Hewitt Tax Service Inc. ("Jackson Hewitt") in 1982.  Jackson Hewitt grew to become the second largest tax preparation company in the United States, behind H&R block.[4]

33.     Jackson Hewitt went public in 1994.  In 1997, the company's board of directors decided to sell the company for $483 million, and Hewitt lost control of the company and was forced into a noncompete contract in the United States until 2000.

34.     Looking to get back into the tax preparation business, Hewitt founded Liberty Tax Service in 1996 after acquiring a Canadian tax preparation firm.  The Company has grown to more than 4,000 offices across North America, and is the third-largest assisted tax preparation company in the United States.

35.     In March 2017, just months before his departure from the Company, Hewitt wrote a revealing article for *Inc.com* .  The article was regarding his "billion-dollar mistake" in losing control of Jackson Hewitt, and that he vowed never to let it happen again.  Hewitt wrote that "[m]y billion-dollar lesson is to keep control of your dream and don't let anyone take it away from you."[5]

---

[3] James Dornbrook, *Competitor fires Hewitt, a tax visionary and former H&R Block employee*, Kansas City Business Journal, Sept. 7, 2017, https://www.bizjournals.com/kansascity/news/2017/09/07/liberty-tax-ceo-john-hewitt-fired.html
[4] *Id.*
[5] John Hewitt, *What This Founder Wishes He Had Known Before Starting His First Company (It Cost Him $1 Billion)*, Inc., March 27, 2017, https://www.inc.com/john-hewitt/notes-to-my-younger-self-what-this-founder-wishes-he-knew-before-starting-first-company.html

36.     To ensure that he would never again be ousted from his own company, Hewitt structured Liberty Tax with a dual class stock structure, with Hewitt alone holding all of Liberty Tax's Class B common stock.  Hewitt wrote that "[w]hen I established Liberty Tax Service, I set it up so I choose the majority of the members of the board of directors to prevent anyone from taking over the company."[6]  According to the Company's SEC filings, Liberty Tax's "Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors."[7]  Hewitt's candor demonstrates that regardless of the fact that the Company had public shareholders, he viewed Liberty Tax as his.  Accordingly, Hewitt elected a majority of board members, all of whom were loyal to him.

### B.      The Skadden Report

37.     According to former Board member John Garel, on July 12, 2017, employees reported a complaint to the Company's ethics hotline regarding Hewitt.[8]  The complaint was referred to the Board's Audit Committee, which hired Skadden to investigate the complaint.  In addition to interviewing employees, Skadden reviewed calendar entries and about 1,000 emails between Hewitt and several female employees and franchisees.  Skadden also scrutinized company credit card charges, including expenses at a New York racetrack.[9]

38.     At the conclusion of the investigation, the Board received an oral report and the Audit Committee received a written report, *i.e.*, the Skadden Report, regarding the findings of the

---

[6] *Id.*
[7] Liberty Tax, Inc., Annual Report (Form 10-K), at 24 (July 7, 2017).
[8] *See* Liberty Tax, Inc., Press Release (Form 8-K/A, Ex. 99.1) (Nov. 13, 2017); *See also* Kimberly Pierceall, *"Mr. Hewitt's conduct … has left me in a very difficult position": 4th Liberty Tax board member leaves.*, The Virginian-Pilot (Nov. 13, 2017) https://pilotonline.com/business/stocks/article_0abfca83-01b5-5798-8d1b-2811fbfca720.html.
[9] Kimberly Pierceall, *Ex-CEO of Liberty Tax likely had sex in his office and dated employees, report says*, The Virginian-Pilot, Nov. 9, 2017, https://pilotonline.com/business/consumer/article_90141e98-cf88-56a8-afcd-e1170fef68c6.html

investigation, which, according to Garel, included credible evidence that Hewitt had engaged in an array of inappropriate conduct, both personally and involving business matters, while serving as the Company's CEO and Chairman.  Hewitt refused to cooperate in the investigation and failed, in any way, to attempt to address or alleviate the concerns of employees.  Rather, Hewitt continued to engage in the same underlying behavior.

39.     The Skadden Report concluded the Company had a "good faith basis" to fire Hewitt "for cause."  Based on this report, the Board also determined the Company had a "good faith basis" to terminate Hewitt as CEO, and did so on September 5, 2017.

40.     The Skadden Report demonstrated that, given the scope and duration of Hewitt's misconduct and Defendants' concealment of it from the investing public, the Company's internal controls were entirely ineffective in identifying and preventing enterprise risk and fraud.

41.     As explained below, the existence and substance of the Skadden Report were not disclosed until months after the Board ousted Hewitt.  Even now, Defendants have continued to conceal from investors the full details of the Skadden Report.

**C.     Hewitt Treated the Company as his "Playground"**

42.     The Skadden Report and CWs reveal that, for years, Hewitt has engaged in a pattern of reckless conduct, including dating countless employees and franchisees, routinely having sex with employees in his office, using millions of dollars of Company resources to further his romantic relationships, making the Company hire his girlfriends' friends and relatives to "made up" positions for which they were nevertheless unqualified, using Company resources for his own personal matters and to benefit his unrelated business, failing to disclose the other compensation or perquisites he received from the Company, and creating a hostile work environment—all of which Defendants concealed from shareholders.

14

43.     As described by *The Virginian-Pilot*, the Skadden Report confirmed that Hewitt had a romantic relationship with at least one employee, but the investigators were told of possible relationships with 10 others.   This report is corroborated by CW1 and CW2, who described Hewitt's romantic relationships with countless of his female employees.   CW1 confirmed that Hewitt dates employees and franchisees.   CW2 notes that Hewitt had so many employee-lovers that people at the Company simply called them "his women."   According to CW2, Hewitt even fathered a child with one of his employees or franchisees.   According to CW2, because the child was around 7-10 years old in 2014, this suggests Hewitt's pattern of dating employees and franchisees goes back to at least 2004-2007.[10]

44.     Unbeknownst to shareholders, Hewitt—with Donovan's knowledge—used the Company and its finances as his personal vehicle to further his romantic interests.   The Skadden Report concluded the Company had a "good faith basis" to fire Hewitt for cause after investigating, among other things, accusations that "Hewitt gave preferential treatment to employees and franchisees he was believed to be involved with romantically, and that ***he placed his personal interests above the company's***."[11]   Notably, the Skadden Report's use of the past tense in the foregoing sentence demonstrates that, contrary to Defendants' Class Period statements, described in detail below, Hewitt's systematic subordination of Company and investor interests to his own had long been a historical fact.   Indeed, unbeknownst to investors, and in the words of CW2, Hewitt treated the Company as his "playground."

---

[10] CW2 learned of this child because his/her duties in the HR department included assisting Hewitt with annual benefits enrollment, leading CW2 to learn that Hewitt had a dependent, whom another employee told CW2 was with a current or former franchisee/employee living in Florida.

[11]     Pierceall,     *Ex-CEO     of     Liberty     Tax     likely     had     sex     in     his     office*, https://pilotonline.com/business/consumer/article_90141e98-cf88-56a8-afcd-e1170fef68c6.html

    **1)**    **"John Hires"**

45.    Skadden investigated allegations that Hewitt hired relatives of female employees he was apparently seeing romantically, and concluded the Company had a "good faith basis" to fire Hewitt for cause. CW1 and CW2 substantiate and expand upon these allegations. CW2, who worked in the Company's HR department, confirms that Hewitt routinely made HR hire friends and relatives of women Hewitt was dating. Hewitt hired these friends and relatives and other people he met so often that they were known in the HR department as "John Hires."

46.    CW2 recalls that the vast majority of John Hires were not qualified for the positions for which Hewitt hired them, and that they were regularly given "outrageous" salaries that were substantially higher than what was paid to other employees. CW2 recalls that Hewitt would often "make up" positions for John Hires. CW2 specifically recalls one John Hire who was given a $75,000 salary yet could not operate his computer, despite this being a job requirement.

47.    CW2 recalls another instance in late 2014/early 2015 when HR suspended a female employee on the sales team for 45 days without pay due to an infraction. After her suspension, the employee, who was rumored to be dating Hewitt, was upset and complained to Hewitt that she could not pay her bills. Hewitt yelled at and reprimanded Kelly McKinney, Vice President of Human Resources, for suspending the employee, and forced HR to pay the employee during her suspension. According to CW2, this "punishment," which amounted to paid time off, became known amongst other employees and had a detrimental effect on morale.

48.    CW1 confirms that, ever since he/she started working at the Company in 2007, it was common knowledge that Hewitt routinely hired friends and relatives of women he was dating. In 2007, for instance, shortly after Hewitt hired Karen Peck, with whom he was romantically involved, he hired Peck's mother and three children to work in the call center.

49.    The John Hires had a material adverse impact on the Company's finances.  CW2, who worked at the Company between 2014 and 2015, stated that the Company creates new budgets that go into effect every June, at the beginning of the Company's fiscal year.  A portion of each budget would be allocated for new hires, and would include a list of positions to be filled and a salary for each open position.  One summer, McKinney and CW2 calculated the financial impact of John Hires, and determined that, in just the approximately two-month period since the beginning of the fiscal year, John Hires *alone* caused the Company to exceed its annual new hire budget by over *$1 million*.

50.    Liberty Tax's net income for fiscal year ended April 30, 2015 totaled only $8.69 million, and its net income for fiscal year ended April 30, 2016 totaled only $19.42 million.  Thus, in just the approximately two-month period since the beginning of the 2015 or 2016 fiscal year when CW2 performed his/her calculations, John Hires alone decreased Liberty Tax's net income by *10.3%* or *4.9%*, respectively.  In addition to her specific knowledge of John Hires detailed below, because of the magnitude of the impact of John Hires on the Company's finances, Defendant Donovan, as the Company's CFO, either knew of or recklessly disregarded the John Hires and their adverse effect on the Company's finances.

### 2)    Fraudulent Franchise Sales and Loans

51.    Hewitt's reckless handling of Company resources does not end with spending untold millions of Company money hiring his girlfriends' friends and relatives.  *The Virginian-Pilot* reports that one incident Skadden investigated involved Hewitt allowing a Company sales employee with whom he was romantically involved to buy a Liberty Tax franchise for a multiple of four times the revenue, and for no money down.

52.    After the relationship ended, Hewitt directed the Company to quickly buy the franchise back, paying his ex-girlfriend more than *seven times* the revenue plus $120,000 in cash

17

and \$100,000 worth of stock. These financial terms were contrary to the Company's typical practice of buying back franchises for wholesale or less than for what they sold it. Indeed, the Company's standard franchise agreement allows the Company to buy back a franchise for only the greater of \$150,000 or 200% of annual gross receipts, clearly showing the terms of this buyback were egregiously out of line with Company practice and caused the Company to lose money on the franchise.[12]

53.     *The Virginian-Pilot* also reports that another female employee and franchisee sought a business loan from the Company and, after a Company employee refused her the loan, she reached out directly to Hewitt, telling him "I love you" and "I miss you" in her emails to him. The employee ultimately received the loan from the Company.

### 3)     Hewitt's Sexual Activity in the Office and Resulting Litigation

54.     CW2 recalls that in Fall 2015, there was a period of time when some employees were required to work on Saturdays. One Monday during this period, an operations manager who worked down the hall from Hewitt's office came to Kelly McKinney, Vice President of Human Resources, to complain that he and several other employees had overheard Hewitt having sex with a female employee in his office multiple Saturdays in a row. The operations manager filed a formal complaint regarding the sexual activity with HR.[13]

55.     Because Hewitt "ruled by fear" and "everyone was terrified of him," CW2 and McKinney had several conversations regarding how best to approach Hewitt about his inappropriate sexual activity in the office. McKinney told CW2 that she had spoken with

---

[12]   Liberty Tax, Inc., Franchise Agreement, at 4 (Sept. 2013), available at https://www.sec.gov/Archives/edgar/data/1528930/000152893014000029/jth-4302014ex1021.htm
[13]   Pierceall, *Ex-CEO of Liberty Tax likely had sex in his office*, https://pilotonline.com/business/consumer/article_90141e98-cf88-56a8-afcd-e1170fef68c6.html

Defendant Donovan and Jim Wheaton,[14] and the three decided the best person to approach Hewitt was Gordon D'Angelo, a longtime friend of Hewitt's whom Hewitt had put on the Board in 2011.

56.     After D'Angelo spoke with Hewitt regarding the sexual activity, CW2 recalls that Hewitt's and McKinney's relationship deteriorated, with Hewitt demoting McKinney to report directly to Defendant Donovan, who had previously been McKinney's peer.

57.     *The Virginian-Pilot* reports that in December 2015, three former employees alleged a hostile work environment relating to Hewitt's sexual activity, and settled with the Company for $500,000.  CW2 recalls that one of these employees was McKinney.

58.     The Company did not disclose this threatened litigation or the details surrounding it, despite that Liberty Tax's net income for fiscal year ended April 30, 2016 was only $19.42 million, and thus this settlement decreased the Company's income that year by **2.5%**.  Nor did the Company report this settlement amount as other compensation or a perquisite to Hewitt.

59.     Remarkably, even after this shameful—and costly—episode, the Company implemented no controls or protocols to prevent Hewitt's creation of a hostile work environment. *The Virginian-Pilot* reports that in July 2017, employees reported to the Company's ethics hotline that Hewitt was again having sex in his office.  This complaint prompted the Board's Audit Committee to hire Skadden to conduct an investigation.  Hewitt's audacity apparently knowing no bounds, employees continued to overhear Hewitt having sex in his office *during Skadden's investigation*.[15]

---

[14]   Jim Wheaton was, at the time, the Company's General Counsel.  *See* https://ir.libertytax.com/news-releases/news-release-details/liberty-tax-service-names-james-j-wheaton-chief-compliance

[15]   Pierceall, *Ex-CEO of Liberty Tax likely had sex in his office*, https://pilotonline.com/business/consumer/article_90141e98-cf88-56a8-afcd-e1170fef68c6.html (reports of Hewitt having sex in his office "were first reported in November 2015 and as recently as August of [2017,]" which was during Skadden's investigation).

### 4)    Hewitt's Use of Corporate Funds for His Lavish Vacations

60.    Hewitt's flagrant abuse of his position and appalling misuse of Company resources was not just limited to workdays.  CW1 stated Hewitt went on weekend getaways with girlfriends at least once every other weekend from 2009/2010 until March 2017.  CW1 stated that these trips were for Hewitt's personal entertainment, but that Hewitt always scheduled a meeting with a franchisee or other Company employee at the destination in order to bill the entire trip to the Company.  These trips included visits to Las Vegas at least three times a year, where Hewitt had the Company foot the bill for stays at lavish resorts such as the Wynn Las Vegas or Caesars Palace. CW1 stated that Hewitt and his girlfriends visited New York City at least four times a year, where Hewitt would book a nice hotel in Midtown Manhattan.

61.    Hewitt also often scheduled out-out-town meetings in cities where the New York Yankees were playing, so that Hewitt could attend the baseball games.  The Skadden Report stated that "[t]he correlation between Yankee games and trainings is so well known throughout the organization that a franchisee once emailed Mr. Hewitt to tell him that a Yankee game was scheduled in his city in the hopes of convincing Mr. Hewitt to agree to conduct a training session in that city."[16]  CW1 corroborates that Hewitt scheduled out-of-town meetings to see Yankees games, and that Hewitt always made sure to have a franchisee or Company employee at the game and expensed charges to the Company.

62.    According to *The Virginian-Pilot*, Skadden also scrutinized Hewitt's Company credit card charges, including expenses at a New York racetrack.  That the Skadden Report concluded the Company had a "good faith basis" to fire Hewitt for cause suggests the scrutiny of Hewitt's Company credit card charges resulted in Skadden finding, consistent with the other

---

[16] *Id.*

allegations herein, that Hewitt had inappropriately expensed personal matters to the Company. CW1 also corroborates this report, stating that Hewitt often went to the New York racetrack with girlfriends and a franchisee or some person associated with the Company and expensed charges to the Company.

### 5)   La Bella Italia

63.      In October 2015, Hewitt, through his personal company JTHJR Inc., bought an Italian restaurant called La Bella Italia.  He used the restaurant to hold Liberty Tax business lunches and mixers for prospective franchisees, "a situation one ethics academic says was a clear conflict of interest.  The implication being:  Liberty Tax could have been billed for the meals and Hewitt would have personally benefitted."[17]   Chris MacDonald, author of The Business Ethics Blog and fellow at Duke University's Kenan Institute for Ethics, stated that Hewitt's "judgment (in things like choosing restaurants) ought to be determined by what's best for the company.  And yet in this situation, any reasonable observer . . . could reasonably worry that the CEO's judgment would be swayed by his or her financial interest in the restaurant."[18]

64.      Though the Company denied any conflict, it appears Hewitt fraudulently used Liberty Tax resources to run La Bella Italia.  *The Virginian-Pilot* reports that, as of October 2017, JTHJR Inc.'s president was Liza Malinis, who was concurrently one of Hewitt's direct reports at Liberty Tax.  CW2 corroborates that Hewitt had a Liberty Tax employee running and managing La Bella Italia for Hewitt.  CW2 confirms that that employee was Liza Malinis.

---

[17] Kimberly Pierceall, *Liberty Tax ex-CEO bought restaurant while leading company. Was it a conflict of interest?*, The Virginian-Plot (Oct. 31, 2017), https://pilotonline.com/business/consumer/liberty-tax-ex-ceo-bought-restaurant-while-leading-company-was/article_a82ff66c-f57b-5989-aa25-6adf1bd7ad60.html
[18] *Id.*

65.     *The Virginian-Pilot* reports that Becky Elder, an ex-Company contractor and franchisee from Georgia "recalled going to the restaurant often before and after Hewitt bought it." Ms. Elder stated that "[t]he whole [marketing] department would be there" and that the company would sometimes host cocktail hours for prospective franchisees the night before sales seminars.[19]

66.     Hewitt told CW1 that Hewitt specifically bought La Bella Italia to hold Company gatherings.  CW1 confirms that the Company was charged for these gatherings, which were held every week from March/April through December/January, during "sales season."  The gatherings were well attended, generally with 40 or so attendees whom Hewitt provided an open bar and heavy hors d'oeuvres.  On an annual basis, the Company paid tens of thousands of dollars to Hewitt's restaurant.

67.     As *The Virginian-Pilot* notes, the SEC "requires a company to note when it has paid a related party, including an executive officer of the company, more than $120,000 in a fiscal year, unrelated to executive compensation."[20]  Despite Hewitt's use of a Liberty Tax employee to run his own personal business, and that Hewitt used Liberty Tax to pay for Company events and meals at La Bella Italia, "[n]one of Liberty Tax's financial filings note related party transactions with Hewitt related to La Bella Italia."[21]

**6)     Hewitt's Behavior Created a Hostile Work Environment that Devastated Company Morale and Resulted in High Employee Turnover and Risk**

68.     The John Hires and Hewitt's other reckless conduct were devastating to employee morale.  CW2 described Liberty Tax as "cash poor" and noted that in 2015 the Company was

---

[19] *Id.*

[20] *Id.*; *see* 17 CFR 229.404 - (Item 404) Transactions with related persons, promoters and certain control persons.

[21]     Pierceall, *Liberty Tax ex-CEO bought restaurant*, https://pilotonline.com/business/consumer/liberty-tax-ex-ceo-bought-restaurant-while-leading-company-was-article_a82ff66c-f57b-5989-aa25-6adf1bd7ad60.html

unable to pay end-of-year bonuses or give full annual merit increases.  CW2 stated that employees were particularly upset by this situation because "everyone knew" Hewitt was "wastefully spending money" on John Hires, among other things.

69.     Moreover, CW2 described multiple complaints she received of Hewitt's cruelty and meanness to employees, and recalled that several employees "literally cried" when complaining of Hewitt's treatment of them.

70.     This account of Hewitt's character is in line with allegations that Hewitt verbally threatened and physically assaulted one of the women with whom he was romantically involved. In early 2017, Tiffany Klein Glenn, one of Hewitt's ex-girlfriends who had also worked at Liberty Tax, sued Hewitt in Virginia state court, alleging that on the night of May 26, 2015, he grabbed her by the throat and pushed her down the stairs inside the house they shared.  He also allegedly threw her boots into a lake near their home and threatened to do the same with her dog.  Hewitt countersued, alleging he was the one injured in the altercation.  Glenn's attorney said Hewitt was arrested and criminally charged at the time, but that Glenn dropped the charges at the urging of Hewitt and his then-attorney.[22]

71.     Given this and the other allegations herein, it is no wonder that CW2 described turnover in the HR department as "outrageous," and noted that anyone who came to Liberty Tax to make positive change at the Company was "public enemy number one" and either left or was fired.

---

[22] Kimberly Pierceall, *CEO of Virginia Beach-based Liberty Tax denies injuring ex-girlfriend in 2015, says he was one hurt*, The Virginian-Pilot (June 27, 2017), https://pilotonline.com/business/article_7c82dba6-28c3-518e-85ec-98e1e96ad139.html;
Kimberly Pierceall, *Liberty Tax CEO sued by ex-girlfriend claiming he shoved her down stairs*, (June 20, 2017), *https*://pilotonline.com/news/local/crime/article_1af7fb4f-d4b8-5745-a071-43241099f230.html

72.     High employee turnover is counterproductive to operations. CW2's recollection of

the high turnover rate is confirmed by the Company's SEC filings:

      a.  On October 10, 2013, for instance, the Company filed a Form 8-K announcing that on October 7, 2013, Liberty Tax's Chief Operating Officer T. Rufe Vanderpool had resigned from the Company;

      b.  On August 18, 2014, the Company filed a Form 8-K announcing that on August 15, 2014, Mark Baumgartner, Chief Investment Officer and CEO of JTH Financial, LLC, a subsidiary of Liberty Tax, resigned from the Company and "will receive the payments to which he is entitled in accordance with the terms of his employment agreement";

      c.  On October 10, 2014, the Company filed a Form 8-K announcing it had hired Robert Lougen as Vice President of Operations, but then just months later, and without explanation, announced that Lougen "ceased to be employed by the Company" as of June 4, 2015; [23]

      d.  On October 16, 2013, during a call with investors, Hewitt noted the Company had hired Kelly McKinney, who "will help us focus on programs to both retain our top talent and attract new talent as we grow." As detailed above, after Hewitt retaliated against McKinney for raising Hewitt's inappropriate sexual activity, McKinney left the company in December 2015 after settling a threatened suit against Hewitt;

      e.  On July 12, 2017—*the same day* the Company's Ethics Hotline received the complaint regarding Hewitt that led to the Skadden investigation— Thomas Daniels, the Company's Chief Accounting Officer, advised the Company he would retire; [24] and

      f.  On September 5, 2017, the same day the Board fired Hewitt, Michael S. Piper, Vice President of Financial Products, provided notice of his retirement. [25]

## D.     Hewitt's Firing and Aftermath

73.     As noted above, the Skadden Report concluded the Company had a "good faith

basis" to fire Hewitt "for cause," but if Hewitt was fired "without cause," he was eligible for

severance. On September 5, 2017, the Board of Directors, the majority of which were handpicked

by Hewitt, fired Hewitt "without cause," effective immediately, which entitled Hewitt to a

---

[23] Liberty Tax, Inc., Press Release (Form 8-K) (Aug. 18, 2014)
[24] Liberty Tax, Inc., Press Release (Form 8-K) (July 12, 2017)
[25] Liberty Tax, Inc., Press Release (Form 8-K) (Sept. 5, 2017)

severance amounting to $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated

74.     The Company announced Hewitt's firing on September 6, 2017.  In that announcement, the Company stated that it was negotiating with Hewitt to repurchase his Class B shares, which permit him to appoint a majority of the Board.  The Company did not disclose the reason for Hewitt's termination or that Skadden had conducted an investigation, but instead misleadingly stated that Liberty Tax "had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the Company as Chief Operating Officer as an interim step before assuming the role of CEO."[26]

75.     The proffered reason for Hewitt's termination was contrary to Hewitt's prior statements concerning a succession plan.  During the March 8, 2017 earnings call with investors, Hewitt mentioned that the Company was considering succession planning and, in response to questioning, he clarified that "it is time that I have a backup in the Company that can help me and make my life easier," and had the following exchange with Alexander Paris Jr., an analyst for Barrington Research Associates:

> **Paris:**  Okay.  So you have no current plans to retire, nor does the Board have any plans to retire you in the near term?
>
> **Hewitt:**  Well, as you remember, I have controlling shares, so—and I do not plan on retiring.  I don't know anything else I could do that would be more fun than what I do, even under any difficult times.
>
> **Paris:**  Okay.  So it's just as you said; it's the natural succession planning for a 67-year old.
>
> **Hewitt:**  Exactly, exactly.

---

[26] Liberty Tax, Inc., Press Release (Form 8-K) (Sept. 8, 2017).

76.     Given this exchange with Hewitt just months prior to the termination announcement, analyst Paris speculated that the Company's announcement of Hewitt's termination meant "something happened to accelerate" the succession plan, and that Hewitt's departure "happened a little sooner than anyone really expected," but he was nevertheless confident about the company's future, stating "[t]here's not going to be any radical changes."[27]

77.     News reports regarding Hewitt's firing were quick to note that the Company had gone "from fast-growing to troubled" recently.[28]

78.     In an apparent move to retain its officers, the Company announced on September 6, 2017 that retention bonuses were awarded to Donovan ($172,526), Vanessa M. Szajnoga ("Szajnoga"), Vice President and General Counsel ($131,532), and Artese, Chief Information Officer ($67,980).  The bonuses were to be paid in two installments, in March and September 2018.[29]

79.     On September 8, 2017, the Company announced the appointment of Ed Brunot as CEO.[30]

80.     On September 15, 2017, General Counsel Szajnoga, referring to Hewitt's firing while holding all Class B shares, stated to a Franchise Times reporter: "I don't believe it poses a problem for the company.  Just to be clear, when you talk about the Class B shares, what that means is essentially [Hewitt] gets to appoint a majority of the board, but obviously our board is a

---

[27] Kimberly Pierceall, *Founder and CEO of Virginia Beach-based Liberty Tax is fired by a board he controlled*, The Virginian-Pilot (Sept. 6, 2017), https://pilotonline.com/business/consumer/article_3957cc1d-5fe0-52b1-8d86-10db04d93816.html

[28] Bob Scott, *Liberty Tax Ends Hewitt's Tenure*, The Progressive Accountant (n.d.), http://www.theprogressiveaccountant.com/Tax/liberty-tax-ends-hewitt-s-tenure

[29] Liberty Tax, Inc., Press Release (Form 8-K) (Sept. 5, 2017)

[30] Liberty Tax, Inc., Press Release (Form 8-K) (Sept. 8, 2017)

group of hard-working board members that share the same responsibilities whether they're appointed by the B shares or the A shares."  Szajnoga went on to say the Company's 500 employees and 2,000 franchisees are "truly a group of pretty dedicated folks whose interest is ensuring that our franchisees have success.  They represent the shareholders' interests" and will continue to make decisions based on that.[31]

81.     On September 28, 2017, unbeknownst to shareholders, a special committee of the Board offered Hewitt its final approved proposal for repurchase of his Class B shares, which Hewitt rejected.  The Company did not disclose the final proposal or Hewitt's rejection of it.

82.     On November 6, 2017, Hewitt unexpectedly removed two Board members, Robert Howard and Thomas Kerskovits, and replaced them with Nicole Ossenfort and John Seal.  Mr. Howard had served on the Audit Committee.  The same day, George Robson, another Board member, announced his retirement effective immediately.  Mr. Robson had served as the chair of the Audit Committee.

83.     Hewitt's removal and election of directors demonstrated that despite being ousted as CEO, he was going to attempt to maintain control of the Company through the Board.

### E.     False and Misleading Statements and Omissions

84.     Throughout the Class Period, Defendants knew that Hewitt's misconduct and Donovan's "spin" rendered false and misleading the Company's public statements concerning the effectiveness of the Company's internal controls, that there was a "risk" that Hewitt's personal interests "may" be adverse to the Company, and that the Company was actively focused on identifying and correcting fraudulent and inappropriate conduct that devalued the Company.

---

[31] Beth Ewen, *Liberty Tax Situation Not a Problem, General Counsel Says*, Franchise Times (Sept. 9, 2017), http://www.franchisetimes.com/news/September-2017/Liberty-Tax-Situation-Not-a-Problem-General-Counsel-Says/

**1)   2013**

85.    On October 1, 2013, Liberty Tax filed with the SEC its Form 10-K for fiscal year

2013 ("2013 10-K"), which was signed by Defendant Hewitt.  The 2013 10-K states:

> ***We are controlled by our Chairman and Chief Executive Officer, whose interests in our
> business may be different from those of our stockholders.***  John Hewitt, our Chairman
> and Chief Executive Officer, currently owns all outstanding shares of our Class B common
> stock.  Our Class B common stock has the power to elect, voting as a separate class, the
> minimum number of directors that constitute a majority of the Board of Directors.  As a
> result, Mr. Hewitt will, for the foreseeable future, have significant influence over our
> management and affairs, given the Board's authority to appoint or replace our senior
> management, cause us to issue additional shares of our Class A common stock or
> repurchase Class A common stock, declare dividends, or take other actions. . . .  ***Mr. Hewitt
> may make decisions regarding our Company and business that are opposed to other
> stockholders' interests or with which they disagree. . . .  To the extent that the interests
> of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class
> A common stock may be harmed.***

86.    The bold and italicized statements in the risk disclosure in paragraph 85 were each

false and misleading and omitted material facts concerning the possibility of Hewitt's interests

conflicting with stockholder interests and his actions possibly damaging Class A common stock

value.  At the time these statements were made: (1) Hewitt's actions and interests in the Company's

business were, in fact, harming other stockholders because Hewitt's actions and interests included,

among other things, furthering his romantic relationships and other personal interests by expending

millions of dollars of Company funds; (2) Hewitt made grossly reckless decisions, detailed above,

to the detriment of the Company; (3) the interests of Class A stockholders were, in fact, being

harmed by Hewitt's actions, ultimately damaging the price of Class A common stock; and (4)

Hewitt thwarted the internal audits to test the effectiveness of the Company's internal controls by

instilling fear in his employees and setting an unhealthy "Tone at the Top."  Hewitt and the

Company knew the foregoing statements were false and misleading at the time they were made,

because:

a.  Hewitt hired countless friends and relatives of female employees he was seeing romantically, who were often given "outrageous" salaries and were often hired to made up positions, despite being unqualified.  These expenditures, as described by CW2, caused the Company to exceed its new hire budget by millions of dollars;

b.  Hewitt routinely promoted his lovers' friends and relatives, despite their lack of qualifications.  These promotions adversely affected employee morale;

c.  Hewitt routinely gave other preferential treatment to his girlfriends, including extending Company business loans, selling franchises, and then buying those franchises back at substantially inflated values, thereby damaging shareholder value;

d.  Hewitt scheduled out-of-town meetings in cities where the New York Yankees were playing, so that Hewitt could attend the baseball games;

e.  Hewitt engaged in other inappropriate use of Company funds, including expensing to the Company lavish vacations with his girlfriends and expensing charges at a New York racetrack to his Company credit card;

f.  Hewitt's tyrannical behavior detailed herein was devastating to employee morale, led to high turnover and created a damaging "Tone at the Top" that prevented management from making reliable representations that its independent auditor could rely upon for purposes of evaluating the effectiveness of the Company's internal controls;

g.  The Company's internal controls were ineffective in detecting and preventing enterprise risk and reporting fraudulent payments and benefits to Hewitt;

h.  Hewitt had actual knowledge of his own misconduct alleged herein; and

i.  Hewitt was the CEO and controlling shareholder and his knowledge can be imputed to the Company.

87.  On October 11, 2013, the Company filed a Form DEF 14A, authorized by Hewitt, which included the "2013 Summary Compensation Table" for the directors and officers of the Company.  In this Table, it is reported that Hewitt received $5,835 in "Other Compensation" regarding which the Company notes: "These amounts reflect the Company's matching contribution under the Company's 401(k) plan."

88.  The Summary Compensation Table referenced in Paragraph 87 is false and misleading and omits material facts as to Hewitt's "Other Compensation" because it grossly underreports amounts received by him.  As required by Item 402, see *infra* Section V.F.2, the Company must report any "other" compensation as defined by the SEC or "perquisites" that confer

29

a direct or indirect benefit on Hewitt.  Hewitt and the Company knew or recklessly disregarded

that these statements were false and misleading at the time they were made because:

    a. To further his personal relationships, Hewitt directed the Company to expend millions of dollars on unnecessary and unqualified "John Hires," from which he indirectly benefited;

    b. To further his personal relationships, Hewitt routinely gave preferential treatment to his girlfriends, including giving them promotions, extending them Company business loans, selling them franchises, and then buying those franchises back at substantially inflated values, from which he indirectly benefited;

    c. Hewitt purposefully scheduled out-of-town meetings in cities where the New York Yankees were playing, so that Hewitt could attend the baseball games at the Company's expense, and he also expensed charges at a New York racetrack, thereby directly benefitting Hewitt;

    d. Hewitt expensed to the Company lavish weekend vacations with his girlfriends that occurred at least twice a month from 2009/2010 through March 2017, thereby directly benefitting Hewitt;

    e. Hewitt had actual knowledge of his own misconduct alleged herein; and

    f. Hewitt was the CEO and controlling shareholder and his knowledge can be imputed to the Company.

### 2)    2014

89.    On June 26, 2014, the Company filed with the SEC its Form 10-K for fiscal year

ended April 30, 2014 ("2014 10-K"), which is the first Class Period SEC filing that Defendant

Donovan signed.  Defendant Hewitt also signed the 2014 10-K.  The 2014 10-K states:

> ***We are controlled by our Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.***  John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock.  Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors.  As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. . . . ***Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. . . . To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed.***

90.     The bold and italicized statements in the risk disclosure in paragraph 89 were each false and misleading and omitted material facts concerning the possibility of Hewitt's interests conflicting with stockholder interests and his actions possibly damaging Class A common stock value.  At the time these statements were made: (1) Hewitt's actions and interests in the Company's business were, in fact, harming other stockholders because Hewitt's actions and interests included, among other things, furthering his romantic relationships and other personal interests by expending millions of dollars of Company funds; (2) Hewitt made grossly reckless decisions, detailed above, to the detriment of the Company; (3) the interests of Class A stockholders were, in fact, being harmed by Hewitt's actions, ultimately damaging the price of Class A common stock; and (4) Hewitt thwarted the internal audits to test the effectiveness of the Company's internal controls by instilling fear in his employees and setting an unhealthy "Tone at the Top."  Defendants knew the foregoing statements were false and misleading at the time they were made, because:

a.  Hewitt hired countless friends and relatives of female employees he was seeing romantically, who were often given "outrageous" salaries and were often hired to made up positions, despite being unqualified.   These expenditures, as described by CW2, caused the Company to exceed its new hire budget by millions of dollars;

b.  Hewitt routinely promoted his lovers' friends and relatives, despite their lack of qualifications.   These promotions adversely affected employee morale;

c.  Hewitt routinely gave other preferential treatment to his girlfriends, including extending Company business loans, selling franchises, and then buying those franchises back at substantially inflated values, thereby damaging shareholder value;

d.  Hewitt scheduled out-of-town meetings in cities where the New York Yankees were playing, so that Hewitt could attend the baseball games;

e.  Hewitt engaged in other inappropriate use of Company funds, including expensing to the Company lavish vacations with his girlfriends and expensing charges at a New York racetrack to his Company credit card;

f.  Hewitt's tyrannical behavior detailed herein was devastating to employee morale, led to high turnover, and created a damaging "Tone at the Top" that prevented management from making reliable representations that its independent auditor could rely upon for purposes of evaluating the effectiveness of the Company's internal controls;

31

g.  The Company's internal controls were ineffective in detecting and preventing enterprise risk and reporting fraudulent payments and benefits to Hewitt;

h.  Hewitt had actual knowledge of his own misconduct alleged herein;

i.  Hewitt was the CEO and controlling shareholder and his knowledge can be imputed to the Company; and

j.  CW2 stated that senior executives were "well aware" of Hewitt's misconduct.  As described in detail herein, CW2 specifically noted that Defendant Donovan was "well in the know" and regularly talked to CW2 about "spinning [Hewitt's misconduct] for the Street," by which she meant Wall Street—*i.e.* investors—and the general public.

91.    The 2014 10-K also states:

***Evaluation of Disclosure Controls and Procedures***

The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2014. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2014, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Management's Report on Internal Control Over Financial Reporting***

[. . .]

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2014. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (1992). ***Based on this assessment, management believes that, as of April 30, 2014, the Company's internal control over financial reporting was effective based on those criteria.***

***Changes in Internal Control over Financial Reporting***

During the year ended April 30, 2014, we implemented changes to our internal controls over financial reporting to fully remediate the material weakness identified in our evaluation of the effectiveness of our internal controls based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (1992) over our April 30, 2013 financial reporting.

The plan to remediate the material weakness was presented to our Audit Committee and we executed our plan during fiscal 2014. ***The remediation plan consisted of modifications and improvements to our internal controls in the areas of staffing, policies and procedures, and training.***

*** Our efforts to remediate the material weakness identified in our 2013 Annual Report on Form 10-K and to enhance our overall control environment have been regularly reviewed with, and monitored by, our Audit Committee. We believe the remediation measures described above have been successful in correcting and remediating the material weakness previously identified and have strengthened and enhanced our internal control over financial reporting.***

92.     The bold and italicized statements in Paragraph 91 regarding the Company's internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein. At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls. Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90.

93.     On August 15, 2014, the Company filed a Form DEF 14A, authorized by the Individual Defendants, which included the "2014 Summary Compensation Table" for the directors and officers of the Company. In this Table, it is reported that Hewitt received $7,035 in "Other Compensation" regarding which the Company notes: "These amounts reflect the Company's matching contribution under the Company's 401(k) plan."

94.     The Summary Compensation Table referenced in Paragraph 93 is false and misleading and omits material facts as to Hewitt's "Other Compensation" because it grossly underreports amounts received by him. As required by Item 402, see *infra* Section V.F.2, the Company must report any "other" compensation as defined by the SEC or perquisites that confer

a direct or indirect benefit on Hewitt.  Defendants knew or recklessly disregarded that these

statements were false and misleading at the time they were made because:

    a. To further his personal relationships, Hewitt directed the Company to expend millions of dollars on unnecessary and unqualified "John Hires," from which he indirectly benefited;

    b. To further his personal relationships, Hewitt routinely gave preferential treatment to his girlfriends, including giving them promotions, extending them Company business loans, selling them franchises, and then buying those franchises back at substantially inflated values, from which he indirectly benefited;

    c. Hewitt purposefully scheduled out-of-town meetings in cities where the New York Yankees were playing, so that Hewitt could attend the baseball games at the Company's expense, and he also expensed charges at a New York racetrack, thereby directly benefitting Hewitt;

    d. Hewitt expensed to the Company lavish weekend vacations with his girlfriends that occurred at least twice a month from 2009/2010 through March 2017, thereby directly benefitting Hewitt;

    e. Hewitt had actual knowledge of his own misconduct alleged herein;

    f. Hewitt was the CEO and controlling shareholder and his knowledge can be imputed to the Company; and

    g. CW2 stated that senior executives were "well aware" of Hewitt's misconduct.  As described in detail herein, CW2 specifically noted that Defendant Donovan was "well in the know" and regularly talked to CW2 about "spinning [Hewitt's misconduct] for the Street," by which she meant Wall Street—*i.e.* investors—and the general public.

    95.    On December 8, 2014, the Company filed with the SEC its Form 10-Q for the

quarterly period ended October 31, 2014 ("Q2 2015 10-Q"), which was signed by the Individual

Defendants.  The Q2 2015 10-Q states:

**RISK FACTORS**
***There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2014.***

[…]

***Evaluation of Disclosure Controls and Procedures***
The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of October 31, 2014.  ***Based on that evaluation, the Chief***

> *Executive Officer and Chief Financial Officer have concluded that, as of October 31, 2014, the Company's disclosure controls and procedures were effective in providing reasonable assurance that information is recorded, processed, summarized and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.*
>
> *Changes in Internal Control over Financial Reporting*
> During our most recent fiscal quarter, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

96.     The bold and italicized statements in Paragraph 95 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90.

### 3)     2015

97.     On March 6, 2015, the Company filed with the SEC its Form 10-Q for the quarterly period ended January 31, 2015 ("Q3 2015 10-Q"), which was signed by the Individual Defendants. The Q3 2015 10-Q states:

> **RISK FACTORS**
> *There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2014.*
>
> […]
>
> *Evaluation of Disclosure Controls and Procedures*
> The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief

Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of January 31, 2015. *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of January 31, 2015, the Company's disclosure controls and procedures were effective in providing reasonable assurance that information is recorded, processed, summarized and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.*

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

98.     The bold and italicized statements in Paragraph 97 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90.

99.     On July 1, 2015, the Company filed with the SEC its Form 10-K for fiscal year ended April 30, 2015 ("2015 10-K"), which was signed by the Individual Defendants.  The 2015 10-K states:

*We are controlled by our Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.*  John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock.  Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors.  As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior

36

management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. . . . ***Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. . . . To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed.***

100.    The bold and italicized statements in the risk disclosure in paragraph 99 were each false and misleading and omitted material facts concerning the possibility of Hewitt's interests conflicting with stockholder interests and his actions possibly damaging Class A common stock value.  At the time these statements were made: (1) Hewitt's actions and interests in the Company's business were, in fact, harming other stockholders because Hewitt's actions and interests included, among other things, furthering his romantic relationships and other personal interests by expending millions of dollars of Company funds; (2) Hewitt made grossly reckless decisions, detailed above, to the detriment of the Company; (3) the interests of Class A stockholders were, in fact, being harmed by Hewitt's actions, ultimately damaging the price of Class A common stock; and (4) Hewitt thwarted the internal audits to test the effectiveness of the Company's internal controls by instilling fear in his employees and setting an unhealthy "Tone at the Top."  Defendants knew the foregoing statements were false and misleading at the time they were made, for the reasons detailed in sub-parts a.–j. of Paragraph 90.

101.    The 2015 10-K also states:

***Evaluation of Disclosure Controls and Procedures***
        The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2015. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2015, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in***

*order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.*

***Management's Report on Internal Control Over Financial Reporting***

[. . .]

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (1992). ***Based on this assessment, management believes that, as of April 30, 2015, the Company's internal control over financial reporting was effective based on those criteria.***

***Changes in Internal Control over Financial Reporting***

During the quarter ended April 30, 2015, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

102.    The bold and italicized statements in Paragraph 101 regarding the Company's internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90.

103.    On August 10, 2015, the Company filed a Form DEF 14A, authorized by the Individual Defendants, which included the "2015 Summary Compensation Table" for the directors and officers of the Company.  In this Table, it is reported that Hewitt received $3,321 in "Other

Compensation" regarding which the Company notes: "These amounts reflect the Company's matching contribution under the Company's 401(k) plan."

104.    The Summary Compensation Table referenced in Paragraph 103 is false and misleading and omits material facts as to Hewitt's "Other Compensation" because it grossly underreports amounts received by him.  As required by Item 402, see *infra* Section V.F.2, the Company must report any "other" compensation as defined by the SEC and perquisites that confer a direct or indirect benefit on Hewitt.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–g. of Paragraph 94.

105.    On September 3, 2015, the Company filed with the SEC its Form 10-Q for the quarterly period ended July 31, 2015 ("Q1 2016 10-Q"), which was signed by the Individual Defendants.  The Q1 2016 10-Q states:

> **RISK FACTORS**
> ***There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2015 filed on July 1, 2015.***
>
> […]
>
> ***Evaluation of Disclosure Controls and Procedures***
> We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of July 31, 2015. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2015, our disclosure controls and procedures were effective in providing reasonable assurance that information is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***
>
> ***Changes in Internal Control over Financial Reporting***

> During our most recent fiscal quarter, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

106.    The bold and italicized statements in Paragraph 105 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90.

107.    On December 9, 2015, the Company filed with the SEC its Form 10-Q for the quarterly period ended October 31, 2015 ("Q2 2016 10-Q"), which was signed by the Individual Defendants.  The Q2 2016 10-Q states:

> **RISK FACTORS**
> ***There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2015 filed on July 1, 2015.***
>
> [...]
>
> ***Evaluation of Disclosure Controls and Procedures***
> We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of October 31, 2015. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of October 31, 2015, our disclosure controls and procedures were effective in providing reasonable assurance that information is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

108.    The bold and italicized statements in Paragraph 107 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

> a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax.

### 4)    2016

109.    On March 3, 2016, the Company filed with the SEC its Form 10-Q for the quarterly period ended January 31, 2016 ("Q3 2016 10-Q"), which was signed by the Individual Defendants. The Q3 2016 10-Q states:

**RISK FACTORS**
***There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2015 filed on July 1, 2015.***

[…]

***Evaluation of Disclosure Controls and Procedures***

41

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of January 31, 2016. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of January 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter ended January 31, 2016, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

110.    The bold and italicized statements in Paragraph 109 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

      a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

      b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile

work environment relating to his sexual activity. To the benefit of Hewitt, the Company settled the claim for $500,000. This settlement represented over 2.5% of the Company's income that fiscal year.

111. On March 4, 2016, the Company conducted a quarterly earnings call to discuss its third quarter 2016 financial results. During the call, Hewitt emphasized the Company's commitment to rooting out fraud and other misconduct at the Company, stating that **"[p]revention of fraud remains a fundamental goal of our Company,"** and that "any inappropriate behavior affects our brand and the integrity of the tax system."[32]

112. The bold and italicized statement in Paragraph 111 regarding the importance of preventing fraud and inappropriate behavior at the Company was false and misleading and omitted material facts concerning Hewitt's reckless and "inappropriate behavior" that at the time the statement was made, his acts were negatively "affect[ing] our brand and the integrity of the tax system." Further, by his own actions, Hewitt knew that Defendants were not actively aspiring to achieve this "fundamental goal" and in fact were taking no meaningful actions toward it. Hewitt knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–i. of Paragraph 90, and also because:

  a. In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and used Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
  b. In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000. This settlement represented over 2.5% of the Company's income that fiscal year.

---

[32] Liberty Tax, Inc., Q3 2016 Earnings Call Transcript (March 4, 2016)

113.    On June 29, 2016, the Company filed with the SEC its Form 10-K for fiscal year ended April 30, 2016 ("2016 10-K"), which was signed by the Individual Defendants.  The 2016 10-K states:

> **We are controlled by our Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.**  John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock.  Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors.  As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. . . .  **Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. . . .  To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed.**

114.    The bold and italicized statements in the risk disclosure in paragraph 113 were each false and misleading and omitted material facts concerning the possibility of Hewitt's interests conflicting with stockholder interests and his actions possibly damaging Class A common stock value.  At the time these statements were made: (1) Hewitt's actions and interests in the Company's business were, in fact, harming other stockholders because Hewitt's actions and interests included, among other things, furthering his romantic relationships and other personal interests by expending millions of dollars of Company funds; (2) Hewitt made grossly reckless decisions, detailed above, to the detriment of the Company; (3) the interests of Class A stockholders were, in fact, being harmed by Hewitt's actions, ultimately damaging the price of Class A common stock; and (4) Hewitt thwarted the internal audits to test the effectiveness of the Company's internal controls by instilling fear in his employees and setting an unhealthy "Tone at the Top."  Defendants knew the foregoing statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

44

    a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and used Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

    b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

115.    The 2016 10-K also states:

***Evaluation of Disclosure Controls and Procedures***

    The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2016.  ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2016, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Management's Report on Internal Control Over Financial Reporting***

[. . .]

    Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (2013).  ***Based on this assessment, management believes that, as of April 30, 2016, the Company's internal control over financial reporting was effective based on those criteria.***

***Changes in Internal Control over Financial Reporting***

    During the quarter ended April 30, 2016, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

116.    The bold and italicized statements in Paragraph 115 regarding the Company's

internal controls were false and misleading and omitted material facts concerning Hewitt's actions,

as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

    a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and used Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

    b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

117.    The 2016 10-K also states:

***We also use a variety of means in an attempt to identify potential compliance issues and require franchisees to address any concerns, including the creation of a Compliance Task Force to examine and prevent non-compliance, fraud and other misconduct among our franchisees and employees.***

[. . .]

Our stock price has been, and may continue to be, subject to wide fluctuations in response to many risk factors listed in this section . . . including: . . . fraud and other misconduct by our franchisees and/or employees[.]

118.    The quoted statements in Paragraph 117 regarding the Company's specific efforts to prevent non-compliance, fraud, and other misconduct among employees and the risks such fraud and misconduct pose to the Company's stock price were false and misleading and omitted material facts concerning Hewitt's inappropriate "Tone at the Top" that prevented the Compliance Task

Force from performing its stated purpose and reporting the fraud described herein.  Defendants

knew or recklessly disregarded that these statements were false and misleading at the time they

were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

    a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and used Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

    b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

119.   On August 8, 2016, the Company filed a Form DEF 14A, authorized by the

Individual Defendants, which included the "2016 Summary Compensation Table" for the directors

and officers of the Company.  In this Table, it is reported that Hewitt received no "Other

Compensation."

120.   The Summary Compensation Table referenced in Paragraph 119 is false and

misleading and omits material facts as to Hewitt's "Other Compensation" because it does not

report amounts received by him.  As required by Item 402, see *infra* Section V.F.2, the Company

must report any "other" compensation as defined by the SEC and perquisites that confer a direct

or indirect benefit on Hewitt.  Defendants knew or recklessly disregarded that these statements

were false and misleading at the time they were made for the reasons detailed in sub-parts a.–g. of

Paragraph 94, and also because:

    a.  Hewitt directed Liberty Tax money and resources to his restaurant La Bella Italia by hosting Company events at the restaurant and by using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax, thereby directly benefitting Hewitt; and

    b.   The Company paid $500,000 to settle a threatened lawsuit based on hostile work environment relating to Hewitt's sexual activity in the office, thereby directly benefiting Hewitt.

121.    On September 2, 2016, the Company filed with the SEC its Form 10-Q for the quarterly period ended July 31, 2016 ("Q1 2017 10-Q"), which was signed by the Individual Defendants.  The Q1 2017 10-Q states:

**RISK FACTORS**
***There have been no material changes in our risk factors from those reported in our Annual Report on Form 10-K for the year ended April 30, 2016 filed with the SEC***.

[…]

***Evaluation of Disclosure Controls and Procedures***
We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of July 31, 2016. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter ended July 31, 2016, there has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

122.    The bold and italicized statements in Paragraph 121 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2)

conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

      a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

      b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.   This settlement represented over 2.5% of the Company's income that fiscal year.

123.    On September 2, 2016, the Company also conducted a quarterly earnings call to discuss its Q1 2017 financial results.   During the call, Hewitt again emphasized the Company's commitment to rooting out fraud and other misconduct at the Company, stating that "***we have continued to intensify our compliance efforts and are committed to a full review in association with the external consultants to ensure all of our franchisees, area developers and employees are held to the highest standards.***"[33]

124.    The bold and italicized language in Paragraph 123 was false and misleading and omitted material facts because management was failing to hold Hewitt to the "highest standard" but rather was knowingly or recklessly permitting him to engage in reckless and fraudulent conduct.   Further, by his own actions, Hewitt knew that Defendants were not actively aspiring to "hold" employees "to the highest standards" and in fact were taking no meaningful actions toward

---

[33] Liberty Tax, Inc., Q1 2017 Earnings Call Transcript (Sept. 2, 2016)

doing so.  Hewitt knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

    a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

    b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

125.    On December 8, 2016, the Company conducted a quarterly earnings call to discuss its Q2 2017 financial results.  During the call, Hewitt again emphasized the Company's commitment to rooting out fraud and other misconduct at the Company, stating that "*[w]e are focused on compliance . . . [and l]ast year worked to put in place measures to ensure we will be a stronger company built on a foundation of integrity.*"  Hewitt further stated that "*Our compliance task force was very successful in analyzing, reviewing and evaluating the work of our compliance department and taking appropriate action to ensure that the standards of the Liberty brand are upheld and that those who do not uphold Liberty standards are exited from the Liberty system.*"  Hewitt went to state that the Company is "*committed to being proactive . . . to protect our brand and the integrity of tax preparation in general.*  We are focused on . . . working to ensure that those we bring on to represent the Liberty brand are upholding our standards."[34]

---

[34] Liberty Tax, Inc., Q2 2017 Earnings Call Transcript (Dec. 8, 2016)

126.    The bold and italicized language in Paragraph 125 regarding specific efforts undertaken to ensure the integrity of the Company, the compliance task force's work to ensure the Company's standards are upheld and to remove those not meeting standards of conduct was false and misleading and omitted material facts because Hewitt engaged in the egregious misconduct and fraud described herein and the inappropriate "Tone at the Top" he set prevented the compliance task force from fulfilling its intended purpose.  Further, by his own actions, Hewitt knew that Defendants were not actively "protecting [the Company's] brand and the integrity of tax preparations in general."  Hewitt knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

a.   In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
b.   In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.   This settlement represented over 2.5% of the Company's income that fiscal year.

127.    On December 9, 2016, the Company filed with the SEC its Form 10-Q for the quarterly period ended October 31, 2016 ("Q2 2017 10-Q"), which was signed by the Individual Defendants.  The Q2 2017 10-Q states:

**RISK FACTORS**
***There have been no material changes in our risk factors from those previously disclosed in Part I. Item 1A of our Annual Report on Form 10-K for the year ended April 30, 2016.***

[…]

***Evaluation of Disclosure Controls and Procedures***

51

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of October 31, 2016. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of October 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter ended October 31, 2016, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

128.    The bold and italicized statements in Paragraph 127 regarding the Company's risk factors and internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; (3) and making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

> a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
> b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile

work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

**5)    2017**

129.   On March 8, 2017, the Company conducted a quarterly earnings call to discuss its Q3 2017 financial results.  During the call, Hewitt again emphasized the Company's commitment to rooting out fraud and other misconduct at the Company, stating:

> In addition to engaging outside industry experts, we have continued to expand the size and scope of our internal compliance efforts, as well as invested in the development of enhanced internal processes and procedures.  As we stated before, there is no place in the Liberty system for those who do not uphold our standards or abide by the law.  And we feel the investments we made are key to maintaining the integrity of the Liberty brand.[35]

130.   The entire quoted text in Paragraph 129 regarding specific efforts undertaken to ensure compliance, maintain the integrity of the Liberty Tax brand, and to remove Liberty Tax employees who do not uphold Company standards and abide by the law was false and misleading and omitted material facts because Hewitt engaged in the egregious misconduct and fraud described herein, including by engaging in illegal conduct including retaliating against employees for protected activity, and by creating an inappropriate "Tone at the Top" which prevented the Company's internal compliance task force from fulfilling its intended purpose.  Hewitt knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

> a.   In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
> b.   In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled

---

[35] Liberty Tax, Inc., Q3 2017 Earnings Call Transcript (March 8, 2017)

for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

131.    On March 9, 2017, the Company filed with the SEC its Form 10-Q for the quarterly period ended January 31, 2017 ("Q3 2017 10-Q"), which was signed by the Individual Defendants. The Q3 2017 10-Q states:

> **RISK FACTORS**
> ***There have been no material changes in our risk factors from those previously disclosed in Part I. Item 1A of our Annual Report on Form 10-K for the year ended April 30, 2016.***
>
> […]
>
> ***Evaluation of Disclosure Controls and Procedures***
> We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of January 31, 2017. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of January 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***
>
> ***Changes in Internal Control over Financial Reporting***
> During our most recent fiscal quarter ended January 31, 2017, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

132.    The bold and italicized statements in Paragraph 131 regarding the Company's risk factors and internal controls were false and misleading because they omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training;

(2) conducting accurate internal audits of the Company's internal controls; and (3) making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

      a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

      b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.   This settlement represented over 2.5% of the Company's income that fiscal year.

133.   On June 14, 2017, the Company conducted a quarterly earnings call to discuss its year end 2017 financial results.   During the call, Hewitt again emphasized the Company's commitment to rooting out fraud and other misconduct at the Company, stating:  "***[w]e have said and will continue to say there is no room in the Liberty system for individuals who do not meet our standards and follow the law.***  We look forward to upholding these values."[36]

134.   The bold and italicized language in Paragraph 133 regarding removing Liberty Tax employees who do not uphold Company standards and abide by the law was false and misleading and omitted material facts because Hewitt engaged in the egregious misconduct and fraud described herein, including by engaging in illegal conduct including retaliating against employees for protected activity, and by creating an inappropriate "Tone at the Top" which prevented the Company's internal compliance task force from fulfilling its intended purpose.   Hewitt knew or

---

[36] Liberty Tax, Inc., Year End 2017 Earnings Call Transcript (June 14, 2017)

recklessly disregarded that these statements were false and misleading for the reasons detailed in

sub-parts a.–j. of Paragraph 90, and also because:

> a. In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
> b. In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000. This settlement represented over 2.5% of the Company's income that fiscal year.

135.    On July 7, 2017, the Company filed with the SEC its Form 10-K for fiscal year

ended April 30, 2017 ("2017 10-K"), which was signed by the Individual Defendants. The 2017

10-K states:

> ***We are controlled by our Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.*** John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock. Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors. As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. . . . ***Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. . . . To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed.***

136.    The bold and italicized statements in the risk disclosure in paragraph 135 were each

false and misleading and omitted material facts concerning the possibility of Hewitt's interests

conflicting with stockholder interests and his actions possibly damaging Class A common stock

value. At the time these statements were made: (1) Hewitt's actions and interests in the Company's

business were, in fact, harming other stockholders because Hewitt's actions and interests included,

among other things, furthering his romantic relationships and other personal interests by expending

millions of dollars of Company funds; (2) Hewitt made grossly reckless decisions, detailed above,

to the detriment of the Company; (3) the interests of Class A stockholders were, in fact, being

harmed by Hewitt's actions, ultimately damaging the price of Class A common stock; and (4)

Hewitt thwarted the internal audits to test the effectiveness of the Company's internal controls by

instilling fear in his employees and setting an unhealthy "Tone at the Top."  Defendants knew the

foregoing statements were false and misleading at the time they were made for the reasons detailed

in sub-parts a.–j. of Paragraph 90, and also because:

    a.  In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

    b.  In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

137.    The 2017 10-K also states:

***Evaluation of Disclosure Controls and Procedures***
    The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2017.  ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2016, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Management's Report on Internal Control Over Financial Reporting***

    [. . .]

    Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2017. In making this assessment,

management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (2013). ***Based on this assessment, management believes that, as of April 30, 2017, the Company's internal control over financial reporting was effective based on those criteria.***

***Changes in Internal Control over Financial Reporting***

During the quarter ended April 30, 2017, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

138.   The bold and italicized statements in Paragraph 137 regarding the Company's internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; and (3) making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

a.   In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and

b.   In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

139.   The 2017 10-K also stated:

We also use a variety of means in an attempt to identify potential compliance issues and require franchisees to address any concerns, including the creation of a Compliance Task Force to examine and prevent non-compliance, fraud and other misconduct among our franchisees and employees.

[. . .]

Our stock price has been, and may continue to be, subject to wide fluctuations in response to many risk factors listed in this section . . . including: . . . fraud and other misconduct by our franchisees and/or employees[.]

140.   The quoted text in Paragraph 139 regarding the Company's specific efforts to prevent non-compliance, fraud, and other misconduct among employees and the risks such fraud and misconduct pose to the Company's stock price was false and misleading and omitted material facts because Hewitt engaged in the egregious misconduct and fraud described herein.  Defendants knew or recklessly disregarded that these statements were false and misleading for the reasons detailed in sub-parts a.–j. of Paragraph 90, and also because:

   a. In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax; and
   b. In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year.

141.   On August 14, 2017, the Company filed a Form DEF 14A, authorized by the Individual Defendants, which included the "2017 Summary Compensation Table" for the directors and officers of the Company.  In this Table, it is reported that Hewitt received $15,731 in "Other Compensation" regarding which the Company notes: "These amounts reflect the Company's matching contribution under the Company's 401(k) plan."

142.   The Summary Compensation Table referenced in Paragraph 141 is false and misleading and omits material facts as to Hewitt's "Other Compensation" because it grossly underreports amounts received by him.  As required by Item 402, see *infra* Section V.F.2, the

Company must report any "other" compensation as defined by the SEC and perquisites that confer a direct or indirect benefit on Hewitt.  Defendants knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–g. of Paragraph 94, and also because:

  a. Hewitt directed Liberty Tax money and resources to his restaurant La Bella Italia by hosting Company events at the restaurant and by using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax, thereby directly benefitting Hewitt; and
  b. The Company paid $500,000 to settle a threatened lawsuit based on hostile work environment relating to Hewitt's sexual activity in the office, thereby directly benefiting Hewitt.

143.    On September 6, 2017, the Company issued a press release stating:

. . . John T. Hewitt, the Company's Chief Executive Officer and Chairman, was terminated yesterday by the Company's Board of Directors (the "Board"), effective immediately.  Mr. Hewitt, who is the sole holder of the Company's Class B common stock ("Class B Shares"), currently remains on the Board.

**_The Company had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the Company as Chief Operating Officer as an interim step before assuming the role of CEO.  The Company is currently finalizing its succession plans, however, the Board has determined that it is in the Company's best interests to terminate Mr. Hewitt at this time._**  The Company intends to announce the new CEO appointment in the coming days.

144.    The bold and italicized statement in Paragraph 143 is false and misleading and omitted material facts because (1) the Company failed to inform investors of the reasons for the Board's termination of Hewitt that was at least premised upon the Skadden investigation; and (2) the statement suggests Hewitt's termination was related to the "deliberate succession planning process" as opposed to his egregious misconduct detailed herein.

145.    On September 11, 2017, the Company filed with the SEC its Form 10-Q for the quarterly period ended July 31, 2017 ("Q1 2018 10-Q"), which was signed by Defendant Donovan. The Q1 2018 10-Q states:

**RISK FACTORS**
*There have been no material changes to our risk factors previously disclosed in Part I. Item 1A of our Annual Report on Form 10-K for the year ended April 30, 2017.*

[…]

***Evaluation of Disclosure Controls and Procedures***
We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of July 31, 2017. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.***

***Changes in Internal Control over Financial Reporting***
During our most recent fiscal quarter ended July 31, 2017, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

146.    The bold and italicized statements in Paragraph 145 regarding the Company's internal controls were false and misleading and omitted material facts concerning Hewitt's actions, as described herein.  At the time these statements were made, Hewitt created a "Tone at the Top" that prevented management from: (1) correcting the systemic problems that Hewitt's reckless and abusive conduct caused in staffing, policies, procedures and training; (2) conducting accurate internal audits of the Company's internal controls; and (3) making reliable representations to its independent auditor concerning the effectiveness of the Company's internal controls.   The Company and Defendant Donovan knew or recklessly disregarded that these statements were false and misleading at the time they were made for the reasons detailed in sub-parts a.–g. of Paragraph 90, and also because:

a. In October 2015, Hewitt bought La Bella Italia and directed Liberty Tax resources to La Bella Italia by hosting Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia rather than performing her duties at Liberty Tax;

b. In November 2015, Hewitt was overheard having sex with a female employee in his office multiple Saturdays in a row, leading to employee complaints, and ultimately led to the threat of a lawsuit based on hostile work environment relating to his sexual activity, which the Company settled for $500,000.  This settlement represented over 2.5% of the Company's income that fiscal year;

c. On July 12, 2017, the Company received a report that Hewitt was again having sex in his office, prompting the Board to hire Skadden to investigate the complaint; and

d. CW2 stated that senior executives were "well aware" of Hewitt's misconduct.  As described in detail herein, CW2 specifically noted that Defendant Donovan was "well in the know" and regularly talked to CW2 about "spinning [Hewitt's misconduct] for the Street," by which she meant Wall Street—i.e. investors—and the general public.

## F.    Applicable SEC Regulations

### 1)    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303

147.    Pursuant to Item 303 and the SEC's related interpretive guidance, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of annual and quarterly filings, such as Form 10-K and 10-Q filings for domestic issuers.

148.    In May 1989, the SEC issued an interpretive release on Item 303 which set forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management

determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

149.    Throughout the Class Period, Item 303 required Defendants to disclose Hewitt's misconduct described herein, which constituted a known trend which had a material adverse impact on the Company's finances, including through fraudulent and frivolous spending, reduced productivity due to high turnover, unqualified hires and redundant or unnecessary job creation, creation and perpetuation of a hostile work environment, and a damaging "Tone at the Top" that prevented accurate audits of the Company's internal controls and management from making reliable representations to the Company's independent auditor.

### 2)    Item 402 of SEC Regulation S-K, 17 C.F.R. § 229.402

150.    Item 402 requires a company to disclose all "perquisites and other personal benefits" provided to senior executives, including a company CEO, "unless the aggregate amount of such compensation is less than $10,000[.]"  SEC guidance provides that "an item is a perquisite if it confers a direct or indirect benefit that has a personal aspect," unless it "is integrally and directly related to the performance of the executive's duties" or is "generally available on a non-discriminatory basis to all employees."  SEC Release Nos. 33-8732 (Aug. 11, 2006).

151.    Item 402 required the disclosure of at least the following "perquisites and other personal benefits" provided to John Hewitt:  (1) using millions of dollars in Company funds to advance his personal relationships by hiring countless friends and relatives of his lovers who were not qualified for the positions for which they were hired and/or were unneeded by the Company; (2) using Company funds to give preferential treatment to his girlfriends, including by extending Company business loans to them, selling them franchises with no money down and then buying those franchises back at substantially inflated values plus hundreds of thousands of dollars in cash and Company stock thereby causing a financial loss to the Company; (3) scheduling out-of-town

meetings in cities where the New York Yankees were playing, so that Hewitt could attend baseball games, and expensing charges at a New York racetrack to his Company credit card; (4) directing Company resources to La Bella Italia by hosting weekly Liberty Tax corporate events at the restaurant and using Liza Milinis, a Liberty Tax employee, to run La Bella Italia for Hewitt; (5) using $500,000 of Company money to settle a threatened lawsuit based on hostile work environment caused by Hewitt's sexual activity in the office; and (6) charging the Company for personal trips with his girlfriends which Hewitt took at least every other weekend from 2009/2010 through March 2017, including to stay at lavish resorts in Las Vegas.  Each of these foregoing items, individually and in the aggregate, conferred either a direct or indirect benefit on Hewitt that had a personal aspect and had an annual value greater than $10,000, and thus was required to be disclosed by the Company.

### G.    The Truth Begins to Emerge

152.    During the Class Period, Hewitt's misconduct as alleged herein caused a series of significant stock price declines.

153.    On February 23, 2015, after the market closed, Liberty Tax filed a Form 8-K and issued a press release announcing declines in customers served and tax returns prepared, and Hewitt was quoted as saying "We are disappointed with our results so far this year."[37]

154.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price dropped *17.20%,* or $5.38, from a close of $34.04 on February 23, 2015, to a close of $28.66 on February 24, 2015, on unusually heaving trading volume.

---

[37] Liberty Tax, Inc., Press Release (Form 8-K) (Feb. 23, 2015)

155.    This decrease in customers served and tax returns prepared was directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished morale, damaging "Tone at the Top," high turnover rate within the Company, and unqualified John Hires.

156.    On April 30, 2015, after the market closed, Liberty Tax filed a Form 8-K and issued a press release announcing fewer tax returns prepared and smaller pricing increases than expected, though Hewitt was quoted as blaming the fact that "The 2015 tax season was disappointing."[38]

157.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price dropped 21.46%, or $5.35, from a close of $27.70 on April 30, 2015, to a close of $23.35 on May 1, 2015, and then dropped another *6.33%*, or $1.37, to a close of $20.98 on May 4, 2015, all on unusually heaving trading volume.

158.    This decrease in tax returns prepared and smaller pricing increases was directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished morale, damaging "Tone at the Top," high turnover rate within the Company, and unqualified John Hires.

159.    On April 27, 2016, after the market closed, Liberty Tax issued a press release again announcing fewer tax returns prepared than expected, though Hewitt was quoted as blaming "industry-wide challenges."[39]

160.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a

---

[38] Liberty Tax, Inc., Press Release (Form 8-K) (Apr. 30, 2015)
[39] Liberty Tax, Inc., Press Release (Form 8-K) (Apr. 27, 2016)

result, the Company's share price dropped 13.37%, or $1.84, from a close of $14.70 on April 27, 2016, to a close of $12.86 on April 28, 2016, and then dropped another *7.34%*, or $0.91, to a close of $11.95 on April 29, 2016, all on unusually heaving trading volume.

161.    This decrease in tax returns prepared was directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished morale, damaging "Tone at the Top," high turnover rate within the Company, and unqualified John Hires.

162.    On September 2, 2016, before the market opened, Liberty Tax filed a Form 8-K and issued a press release announcing results for the quarter ending July 31, 2016.  The press release revealed that, compared to the prior year's first quarter, the Company's revenues and fee income were lower, while losses were higher, as were the Company's debts on its revolving credit facility.  The Company also held a conference call that morning.  On that call, Defendants downplayed the negative results, blaming them on, among other things, investments in various endeavors and one-off expenses.  For example, Defendant Donavan stated that expense increases were driven by, among other things, "separation costs for a former executive," and by "increased employee compensation and benefits," while failing to disclose the financial impact of John Hires.[40]

163.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price dropped *5.33%,* or $0.70, from a close of $13.48 on September 1, 2016, to a close of $12.78 on September 2, 2016, on unusually heavy trading volume.

164.    The Company's diminished revenues and increased losses were directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished

---

[40] Liberty Tax, Inc., Q1 2017 Earnings Call Transcript (Sept. 2, 2016)

morale, damaging "Tone at the Top," high turnover rate within the Company, unqualified John Hires and other diversion of millions in Company money to further Hewitt's personal interests.

165.    On December 8, 2016, before the market opened, Liberty Tax filed a Form 8-K and issued a press release announcing earnings for the quarter ending October 31, 2016.  The Company again announced disappointing results compared to the prior year period, with lower revenues, larger losses, and increased GAAP expenses, as well as increased reliance of the Company's revolving credit facility.

166.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price dropped *4.6%*, or $0.60 from a close of $13.35 on December 7, 2016, to a close of $12.75 on December 8, 2016, on unusually heaving trading volume.

167.    The Company's diminished revenues, increased losses, and increased GAAP expenses were directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished morale, damaging "Tone at the Top," high turnover rate within the Company, unqualified John Hires and other diversion of millions in Company money to further Hewitt's personal interests.

168.    On June 14, 2017, before the market opened, Liberty Tax filed a Form 8-K and issued a press release announcing results for fiscal year 2017. The Company again announced disappointing results compared to the prior year, with fewer tax returns prepared, increased operating expenses, and decreased net income. The press release quoted Hewitt as saying "This season's results were clearly disappointing."[41]

---

[41] Liberty Tax, Inc., Press Release (Form 8-K) (June 14, 2017)

169.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price dropped ***11.87%***, or $1.45, from a close of $12.95 on June 13, 2017, to a close of $11.50 on June 14, 2017, on unusually heaving trading volume.

170.    The Company's decrease in tax returns prepared, increased operating expenses, and decreased net income were directly caused by diminished productivity due to Hewitt's creation of a hostile work environment and diminished morale, damaging "Tone at the Top," high turnover rate within the Company, unqualified John Hires and other diversion of millions in Company money to further Hewitt's personal interests.

171.    On November 7, 2017, after the market closed, the Company announced the sudden resignation of Defendant Donovan, without explanation.

172.    As reported in the press, Donovan's departure "came a day after ex-CEO John T. Hewitt, who was fired in September but maintained control of the board with his class of shares, replaced two members of the nine-member board.  Another board member retired the same day." The same news report noted that "Donovan would have been eligible for a $172,526 retention bonus after Hewitt's firing if she had stayed with the company until at least September 2018."[42]

173.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price ***dropped 16.98%*** the next day, dropping from a close of $13.25 per share on November 7 to close at $11.00 per share on November 8.

---

[42] Kimberly Pierceall, *Day After ex Ceo shakes up Liberty Tax board, CFO announces resignation*, The Virginian-Pilot (Nov. 7, 2017), https://pilotonline.com/business/jobs/article_244577b3-a89e-576e-acce-9d582afc286c.html

174.    On November 9, 2017, *The Virginian-Pilot* released a bombshell report titled "Ex-CEO of Liberty Tax likely had sex in his office and dated employees, report says" containing salacious details from the Skadden Report, which had apparently been leaked.[43]  The November 9 Article revealed, among other things, that Hewitt gave preferential treatment to employees and franchisees he was believed to be involved with romantically, and placed his personal interests above the Company's.

175.    The same day, the Company filed a Form 8-K announcing that John Garel would not stand for re-election "due to his concerns about recent Company events[.]"[44]

176.    On November 13, 2017, the Company filed Garel's resignation letter, dated November 10.  The letter states, in pertinent part:

> I believe that one of my important functions as an Independent Director on the Board was to speak up on behalf of the Company and the common stockholders and act as a counterbalance when Mr. Hewitt exerted his position in a manner I thought may not be in the best interests of all stockholders or the Company. I have done my best to perform this function at all times.
>
> In this regard, I want to express that, in my view, Mr. Hewitt's exercise of his class B rights has resulted in problems for the Company and disagreements on the Board. These concerns have become exacerbated over the past several months.
>
> On July 12, 2017, the Company received an Ethics Hotline complaint regarding Mr. Hewitt. This complaint was referred to the Audit Committee who determined that an inquiry into the report be conducted by Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden"). The Audit Committee and the full Board received an oral report and the Audit Committee received a written report regarding the findings of this investigation, which included credible evidence that Mr. Hewitt had engaged in an array of inappropriate conduct, both personally and involving business matters, while serving as Liberty Tax's CEO and Chairman. Mr. Hewitt refused to cooperate in the investigation and failed to, in any way, attempt to address or alleviate the concerns of employees. Rather, Mr. Hewitt continued to engage in the

---

[43] Because, according to former Board member Garel, the written report was provided only to the Audit Committee, and because two members of the Audit Committee had resigned or been fired just three days before, it is reasonable to infer that one of the two departed Audit Committee directors leaked the Skadden Report.

[44] Liberty Tax, Inc., Press Release (Form 8-K) (Nov. 9, 2017)

same underlying behavior. The board determined that Liberty had a good faith basis to terminate Mr. Hewitt as CEO, and he was in fact terminated on September 5, 2017. Aspects of this report have now been disclosed through the press.

On September 6th, 2017, the Company publicly announced the following: "The Company has been in negotiations to enter into agreements for Mr. Hewitt's separation and the repurchase of his Class B Shares, which permit him to appoint a majority of the Board.  No such agreements have been reached, and whether the Company will enter into such agreements with Mr. Hewitt remains uncertain at this time."

The successful completion of those negotiations would have alleviated my personal concerns regarding continued participation on a company Board with Mr. Hewitt. Since late July 2017, I participated on a Special Committee of the Board comprised of the Company's Independently-elected Directors and authorized by the full Board to negotiate with Mr. Hewitt for said purchase of his class B control shares, and his full separation from any Board or managerial activities.  This Special Committee worked with management, advisors, and the Company's lenders. On September 28th, 2017, the Special Committee offered Mr. Hewitt its final approved proposal, which Mr. Hewitt rejected.

Most recently, two directors were removed on November 5th, 2017, one resigned on November 6th, 2017, the Chief Financial Officer resigned on November 7th, 2017, and Vice President Financial Products resigned on September 5, 2017. These changes contravene the Board's decision to terminate Mr. Hewitt and allow him via his class B rights to, in effect, manage the Company. In the face of these developments, the Class A Independent Directors on the Board made the following requests of Mr. Hewitt, which we believe would be in the best interests of the stockholders: namely, that Mr. Hewitt (i) be removed immediately as Chairman by the Board, (ii) voluntarily agree to resign from the Board, (iii) agree to the Company's September 28 offer to purchase his Class B shares, and (iv) issue a press release about the Audit Committee report concerning Mr. Hewitt's conduct in order to best position the Company to deal with the ramifications of any press coverage about the report and protect its reputation. Mr. Hewitt, with the support of the other Class B directors, rejected these requests.

At this point, after careful consideration and knowing that I have put a tremendous amount of effort into serving the Liberty Tax stockholders in addressing what I have described above, I have decided I can no longer remain as a director of Liberty Tax, Inc., and I hereby tender my notice that I will not seek re-election at the next annual shareholders meeting.

177.    The same day, law.com published an article[45] describing the situation at Liberty Tax as follows:

> The brouhaha has led to dissension on the board; the departures of three directors, plus the chief financial officer and a vice president; and the resignation of a fourth director in a letter of protest made public on Monday.
>
> "That's a disaster," said one lawyer who works on corporate governance issues . . . . If Hewitt were listening to an advisor, the attorney said, "someone should advise him that the entire company could implode."

178.    On December 11, 2017, before the market opened, the Company filed a Form 8-K and issued a press release announcing that on December 8, 2017, KPMG resigned as the Company's independent registered public accounting firm, and as a result the Company would delay the filing of its Quarterly Report on Form 10-Q for the quarter ended October 31, 2017.  The 8-K stated:

> **KPMG expressed to the Audit Committee and Company management its concern that the actions of former Chief Executive Officer John T. Hewitt**, who remains the Chairman of the Board and controlling stockholder as the sole holder of the Company's outstanding Class B common stock, **have created an inappropriate tone at the top which leads to ineffective entity level controls over the organization**. Prior to the termination of Mr. Hewitt's employment as Chief Executive Officer of the Company on September 5, 2017, the Audit Committee oversaw an investigation of allegations of misconduct by Mr. Hewitt. In particular, KPMG noted that Mr. Hewitt took actions to replace two independent members of the Board around the time information relating to this investigation appeared in media reports. KPMG also noted that following the replacement by Mr. Hewitt of two Class B directors, the chair of the Audit Committee retired from the Board, the Company's Chief Financial Officer announced her intention to resign from the Company, and another independent member of the Board announced that he would not stand for reelection at the Company's next annual meeting. Further, **KPMG was made aware that following his termination as Chief Executive Officer, Mr. Hewitt may have continued to interact with franchisees and area developers of the Company. Although Mr. Hewitt stated to KPMG during a meeting on November 9, 2017 that he would not reinsert himself into the management of the**

---

[45] Sue Reisinger, *Sex in the Office, Dual Stock Structure Make for a Corporate Governance 'Disaster'*,    Corporate    Counsel    Powered    by    Law.com    (Nov.    13,    2017), https://www.law.com/corpcounsel/sites/corpcounsel/2017/11/13/sex-in-the-office-dual-stock-structure-make-for-a-corporate-governance-disaster/

> *Company, in light of Mr. Hewitt's actions and his ability to control the Board as the sole holder of the Class B common stock, KPMG informed the Audit Committee and management that it has concerns regarding the Company's internal control over financial reporting as related to integrity and tone at the top and such matters should be evaluated as potential material weaknesses.*
>
> *Specifically, KPMG informed the Audit Committee and management that Mr. Hewitt's past and continued involvement in the Company's business and operations, including his continued interactions with franchisees and area developers of the Company, has led it to no longer be able to rely on management's representations, and therefore has caused KPMG to be unwilling to be associated with the Company's consolidated financial statements.* In notifying the Company of its resignation, KPMG advised the Audit Committee and management that it is not aware of any information that cause it to question the integrity of current management, but rather that the structural arrangement by which Mr. Hewitt controls the Company is the cause of KPMG's concerns. KPMG also noted that because certain information known to the Board regarding the reasons that the Board terminated Mr. Hewitt as Chief Executive Officer had not been disclosed to the current Chief Executive Officer and Chief Financial Officer, KPMG was uncertain as to whether it could continue to rely on management's representations.[46]

179. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, the Company's share price **dropped 5.4% before the market opened**, to open at $11.30 per share, down from the prior trading day's closing price of $11.95. Liberty Tax's shares continued to drop throughout the trading day on December 11, 2017, ultimately closing at 11.15, a **6.69%** drop from the prior trading day's closing price on volume of 170,000 shares.

180. On December 14, 2017, the Company filed a Form 8-K announcing the appointment of Nicholas Bates as CFO, effective January 1, 2018.

181. On December 18, 2017, the Company filed a Form 8-K announcing the resignation of Board member Steven Ibbotson, effective immediately. In his resignation letter, dated December 15, 2017, Ibbotston stated that he was resigning "because I materially disagree with

---

[46] Liberty Tax, Inc., Press Release (Form 8-K) (Dec. 11, 2017)

certain aspects of how the Company is being managed by Mr. Hewitt. . . .  I no longer believe that I can have a meaningful influence on the management of the company, and accordingly, I no longer believe that I can be an effective member of the Board of Directors in serving the interests of shareholders and therefore am compelled to resign."[47]

182.    The same day, the Company filed a Form 8-K announcing the resignation of John Garel, effective immediately.  Garel had previously stated he would not seek reelection, but resigned because "[t]he Class B Directors are acting in unison through Mr. Hewitt's Class B rights and are, in my judgment, unwilling to consider input that interferes with their objectives, with which I materially disagree."[48]

183.    On December 19, 2017, Liberty Tax filed a Form 8-K attaching a press release announcing that the Company had received a notice of delinquent filing from Nasdaq for failing to file its Form 10-Q.  The Company stated that it "continues to work expeditiously to secure representation from a new independent public accounting firm and to file its Form 10-Q as soon as practicable."[49]

184.    On January 8, 2018, Liberty Tax filed a Form 8-K attaching a press release announcing that the Company had received a notice of delisting or failure to satisfy a continued listing rule or standard.  The notice stated that, because of the resignations of Garel and Ibbotson as directors, both of whom served on the Audit Committee, the Company is no longer in compliance with Nasdaq Listing Rule 5605(c)(2), which requires that audit committees consist of at least three members, each of whom must be independent.

---

[47] Liberty Tax, Inc., Press Release (Form 8-K, Ex. 17.1) (Dec. 18, 2017)
[48] Liberty Tax, Inc., Press Release (Form 8-K, Ex. 17.1) (Dec. 18, 2017) (Second 8-K filed Dec. 18, 2017)
[49] Liberty Tax, Inc., Press Release (Form 8-K, Ex. 99.1) (Dec. 19, 2017)

185.    On February 19, 2018, after the market closed, Liberty Tax released a statement announcing "the appointment of Nicole Ossenfort as President and Chief Executive Officer of the Company, effective immediately.  Ms. Ossenfort replaces Edward L. Brunot, whose employment was terminated by the Company's Board of Directors on February 19, 2018."[50]  The statement noted that "[i]n connection with her appointment as President and Chief Executive Officer of the Company, Ms. Ossenfort resigned as a director of the Company at the request of the Board."  The Company did not file the statement with the SEC.  The Company also released statements announcing the appointment of Shaun York as the Company's Chief Operating Officer, effective immediately,[51] and the appointment of Ryan Dodson as Chief Strategy Officer, effective immediately.[52]

186.    Media reactions the same day emphasized the unusual timing of the drastic change. One article, titled "Liberty Tax fires latest CEO mid-tax season, 6 months after firing founder John Hewitt," noted that "Liberty Tax has fired its CEO—in the thick of tax season and after only six months on the job—replacing him with a board member handpicked by founder John T. Hewitt[.]" The same news report revealed that, "[i]n an email obtained by *The Pilot* and purportedly sent from Ossenfort to Liberty [Tax] staff and franchisees, the new CEO notes that Hewitt will serve in an advisory role and remain chairman of the board."  The report further noted that Ossenfort's

---

[50] Liberty Tax, Inc., *Liberty Tax Service Inc. Taps Nicole Ossenfort to be CEO*, Globe Newswire (Feb. 19, 2018), https://globenewswire.com/news-release/2018/02/19/1361484/0/en/Liberty-Tax-Service-Inc-Taps-Nicole-Ossenfort-to-be-CEO.html
[51] Liberty Tax, Inc., *Shaun York to be the Chief Operating Officer for Liberty Tax Service*, Liberty Tax, Inc. (Feb. 19, 2018), https://ir.libertytax.com/news-releases/news-release-details/shaun-york-be-chief-operating-officer-liberty-tax-service
[52] Liberty Tax, Inc., *Liberty Tax Names Ryan Dodson Chief Strategy Officer*, Liberty Tax, Inc. (Feb. 19, 2018), https://ir.libertytax.com/news-releases/news-release-details/liberty-tax-names-ryan-dodson-chief-strategy-officer

existing ties to Liberty Tax could pose a conflict of interest, including because, at the time she was brought onto the Board, she and her husband, owners of Liberty Tax franchises in South Dakota and Wyoming since 2002, still owed the Company $10,932 in royalties, advertising and fees.[53]

187.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, on February 20, 2018, the Company's share price plunged ***17.65% over the course of the trading day*** to close at $8.40 per share, down from a close of $10.20 per share the prior trading day, on volume of 228,500.

188.    As Liberty Tax's stock plunged on February 20, 2018, the *Associated Press* picked up the story of Brunot's firing and at 10:13 a.m. published an article titled "Liberty Tax Fires Second Chief Executive in 6 Months."[54]  Later the same day, at 3:43 p.m., *Bloomberg* published an article titled "Liberty Tax Plunges to Record on CEO Ouster; Barrington Cuts."  The *Bloomberg* article noted that the Company's stock fell to "the lowest price on record, on more than three times the average daily trading volume over the past three months after the company's board of directors fired CEO Edward Brunot."[55]

189.    Another news report published on February 20, 2018 quoted analyst Lee Jogoda with CJS Securities as stating that the recent management changes, while billed as bringing

---

[53] Kimberly Pierceall, *Liberty Tax fires latest CEO mid-tax season, 6 months after firing founder John Hewitt*, The Virginian-Pilot (Feb. 19, 2018), https://pilotonline.com/business/consumer/article_aca42b52-4d4e-5a22-88ed-bddaa49a22e0.html

[54] Associated Press, *Liberty Tax fires second chief executive in 6 months*, The Washington Post (Feb. 20, 2018), https://www.washingtonpost.com/national/liberty-tax-fires-second-chief-executive-in-6-months/2018/02/20/e3e380d0-1650-11e8-930c-45838ad0d77a_story.html?utm_term=.1f7cd52987fb

[55] Lisa Fu, *Liberty Tax Plunges to Record on CEO Ouster; Barrington Cuts,* Bloomberg First Word (Feb. 20, 2018)

franchisee experience into the executive offices, "appears to be a continuation of the control that Chairman John Hewitt refuses to relinquish despite his firing as CEO." Jagoda also stated that the hiring of York and Dodson "also appear to strengthen Hewitt's influence in the C-suite," referring to the executive positions that typically have a "chief" in their titles.[56] Jagoda stated that he foresaw "one of two things happening: Liberty gets delisted from the Nasdaq exchange because it is unable to find two willing independent board members or, less likely, Hewitt finds a financial partner that keeps him in control but takes the company private." The news report noted that Barrington Research downgraded Liberty Tax to market perform from outperform after the management shakeup on February 19, and quoted analyst Alexander Paris as stating that his firm could not in good conscience rate Liberty Tax's stock "outperform" anymore, "given the war in the Board Room, the changes in the c-suite and the delinquent financial filings" due to the resignation of KPMG in December. Barrington Research stated it would reconsider its rating once the Company was stable and compliant in its financial filings.[57]

190.  On February 21, 2018, after the market closed, the Company filed a Form 8-K announcing the resignation of Ross Longfeld, the sole remaining Class A board member. Longfeld's resignation letter, filed with the Form 8-K, stated:

> Please consider this my resignation as a board member effective March 21, 2018. Until now, I have remained on the board even after the recent departure of all of the other Class A independent directors, despite my complete agreement and understanding of the reasons given for their leaving as stated in their resignation letters.
>
> My purpose in staying on the board was to represent the Class A shareholders as best I could as the last remaining independent director. I felt that I could do this by staffing, albeit as the only member, the Independent Committees of the board.

---

[56] Kimberly Pierceall, *Virginia Beach-based Liberty Tax's stock drops 18 percent day after CEO was fired*, The Virginian-Pilot (Feb. 20, 2018), https://pilotonline.com/business/stocks/article_e458d048-c918-51c8-bb8f-baf265b84a4c.html
[57] *Id.*

Also, as Audit Committee chair, I could work with management and the board to resolve "Tone At The Top" and other issues that led to the recent resignation of our long time auditors, KPMG.  *The Tone at The Top issue remains, and has greatly impeded the company in finding a national audit firm to accept an engagement, which is critical to our status as a publicly traded company.*

Further, in my role as chair of the Nominating and Governance Committee I have worked closely with management and the board to identify highly qualified candidates for the three open Class A directorships.

However, the results of the Board meeting held on February 19th have made it clear that my efforts have been to no avail.  At that meeting, as detailed in the written resolutions, John Hewitt, in his role as Chairman of the Board and sole Class B shareholder, proposed and had passed by his majority Class B board members, the following actions:

- The immediate termination of CEO Edward Brunot.

- The immediate termination of the short-term consulting agreement with former CFO Kathy Donovan who was assisting the company in many areas.

- The appointment of Class B director Nicole Ossenfort as CEO, along with two other Hewitt associates, in the roles of Chief Operating Officer and Chief Strategy Officer, *further strengthening his influence and control as demonstrated in an email from Ossenfort stating that Hewitt will act in an advisory role.*

- The replacement of the Company's law firm Skadden Arps, a highly regarded firm with deep experience in corporate governance matters.  Further, the appointment of the law firm of Williams Mullen, John Hewitt's personal counsel, to serve as the company's Corporate General Counsel.

- The appointment of William Minner to replace Nicole Ossenfort as a class B director, and further, his appointment as chair of the Audit and Compensation committees.

- The termination of the previously board-approved process already well underway with the National Association of Corporate Directors to identify and recruit highly qualified Independent Directors. (Several were in the process of personal interviews during the week of February 20th)

- In place of the above nominating process, John Hewitt would immediately submit three candidates for consideration to fill the three Class A vacancies with the intention of electing all of these new directors as Class A directors at a special shareholders meeting to be held no later than April 16th 2018.

All of these actions further undermine any semblance of an independent representation for Class A shareholders in Liberty Tax Service. *Furthermore, it*

*has quickly become apparent to me that the board and the new senior executives are making it virtually impossible for the Chief Financial Officer and the General Counsel to do their jobs effectively, <u>particularly as these three new executives are not qualified to hold these positions in a public company and they are all beholden to John Hewitt.</u>* [58]

191.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, on February 22, 2018, the Company's share price dropped ***3.88%*** to close at $8.65 per share, down from a close of $9.00 per share the prior trading day.

192.    On February 23, 2018, after the market closed, the Company filed a Form 8-K and issued a press release announcing the appointment of Ossenfort as CEO, York as Chief Operating Officer, Dodson as Chief Strategy Officer, Minner as a Board member, and the termination of the consulting agreement with Donovan, the departure of officers Szajnoga and Artese.

193.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and, as a result, on February 24, 2018, the Company's share price dropped ***3.15%*** to close at $8.28 per share, down from a close of $8.55 per share the prior trading day.

### H.    Post-Class Period Developments

194.    On March 16, 2018, the Company filed a Form 8-K announcing that, the previous day, it had received an additional notice of delinquent filing from Nasdaq for failing to file its Form 10-Q.  The notice granted an extension of time until June 11, 2018 to file the Form 10-Qs for quarters ended October 31, 2017 and January 31, 2018 to regain compliance with Nasdaq Listing Rule 5250(c)(1).

---

[58] Liberty Tax, Inc., Press Release (Form 8-K, Ex. 17.1) (Feb. 21, 2018)

195.    On April 19, 2018, the Company filed a Form 8-K announcing that the Audit Committee of the Board engaged Carr Riggs and Ingram LLC ("CRI") as its independent registered public accounting firm for the fiscal year ending April 30, 2018, effective immediately.

196.    On May 15, 2018, the Company announced that Nicholas Bates, the CFO who replaced Donovan, provided notice of his resignation, effective June 15, 2018 following the anticipated filing of the Company's delinquent Form 10-Qs.  On May 21, 2018, the Company filed a Form 8-K/A to note that Mr. Bates will be paid $300,000 in severance and the value of 1/3 of his outstanding restricted stock.

197.    On June 7, 2018, the Company filed a Form 8-K announcing that, on June 5, 2018, CRI, its new accounting firm that replaced KPMG, "provided notice of its resignation as the independent registered public accounting firm" of the Company, "effective as of the same date."[59] The Company further stated that "CRI's decision to resign was not recommended or approved by either the Audit Committee or the Board of Directors of the Company."[60]  CRI's resignation letter, attached to the Form 8-K, does not provide a reason for its resignation.

198.    Notably, CRI's resignation came just days before it was due to provide its opinion of the Company's financial statements based on its audits in connection with the Company's delinquent Form 10-Qs by the June 11, 2018 deadline set by Nasdaq.

199.    On this news, on June 8, 2018, the Company's share price dropped ***13.89***% to close at $9.30 per share, down from a close of $10.80 per share the prior trading day.

200.    As of June 12, 2018, the date of this Amended Complaint, Liberty Tax had not filed its delinquent Form 10-Qs, nor had it offered investors any explanation for its failure to meet the

---

[59] Liberty Tax, Inc., Press Release (Form 8-K) (June 7, 2018)
[60] *Id.*

June 11, 2018 deadline set by Nasdaq.  Having missed the June 11, 2018 deadline, on June 12, 2018, the Company's share price dropped **6.74%** to close at $8.65 per share.

## I.    Additional Scienter Allegations

201.    Because Hewitt engaged in the conduct described herein, which rendered the statements alleged herein false and misleading, he made the statements knowing them to be false and misleading, or, at the very least, with reckless disregard for their truth or falsity.

202.    CW2 stated that senior executives were "well aware" of Hewitt's misconduct. CW2 specifically noted that Defendant Donovan was "well in the know."  CW2 and McKinney would often meet with Donovan to discuss issues relating to Hewitt, including problems with John Hires and Hewitt's general cruelty and meanness to several employees.  CW2 recalls these meetings happened dozens of times throughout his/her time with Liberty Tax.  CW2 stated that CW2 and McKinney would figure out the best way to bring these issues up with Hewitt.  As detailed above, in Fall 2015, CW2 discussed with McKinney the complaints of Hewitt's sexual activity in the office, and McKinney told CW2 she reported these complaints to Donovan, and together with Jim Wheaton the three suggested then-Board member D'Angelo raise the issue with Hewitt.

203.    CW2 also recalled specific conversations he/she had with Donovan regarding Hewitt's "frivolous spending and budgeting."  CW2 recalled what he/she interpreted as a "concerted effort" by Donovan to conceal these activities from investors.  CW2 recalled specific conversations with Donovan in which Donovan regularly talked about "spinning things for the Street," by which she meant Wall Street—*i.e.* investors—and the general public.  The things Donovan was "spinning for the street" were, among other things, the fact that Liberty Tax was

cash poor and concealing from investors John Hewitt's misconduct, including the John Hires and inappropriate sexual relations with employees.

204.    Furthermore, the timing of Donovan's resignation—merely *two days* before *The Virginian-Pilot*'s November 9 Article—raises a strong inference that Donovan left the Company in part because she had been contacted by *The Virginian-Pilot* for comment, such that she knew Hewitt's misconduct, which she had helped conceal from investors for years, would come to light imminently.

205.    Events subsequent to the Class Period also support a finding that Defendants acted with scienter.  Specifically, it took Liberty Tax four months after KPMG's resignation to secure CRI to serve as independent registered public accounting firm to the Company.  Then, less than two months later, and just days before the Company was due to file its delinquent Form 10-Qs, on June 5, 2018, CRI provided notice of its resignation effective immediately, without explanation. According to Liberty Tax's Form 8-K filing, CRI's decision to resign was not recommended or approved by either the Audit Committee or the Board of Directors of the Company.

206.    Additionally, due to the Company's inability to secure an independent registered public accounting firm, the Company has been unable to file its periodic filings with the SEC and has been notified by Nasdaq that it will be delisted unless it satisfies its disclosure requirements and files its outstanding Form 10-Qs by June 11, 2018.  The Company's failure to secure an accounting firm that will rely upon the representations of management while Hewitt continues to control Liberty Tax supports a finding that Defendants historically provided unreliable representations to KMPG, Defendants did so knowingly or with a reckless disregard for the truth, and that in fact statements concerning the effectiveness of the Company's internal controls made during the Class Period were false and misleading.

## VI.      CLASS ACTION ALLEGATIONS

180.    Lead Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on its own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased Liberty Tax securities during the period between October 1, 2013 through and including February 23, 2018, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

207.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Liberty Tax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

208.    Lead Plaintiff's claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

209.    Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

> a.   whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;
> b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Liberty Tax;

      c.  whether the price of Liberty Tax Class A common stock was artificially inflated and/or maintained during the Class Period; and

      d.  to what extent the members of the Class have sustained damages and the proper measure of damages.

210.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

211.    Lead Plaintiff will fairly and adequately represent the interests of the Class in that it has no conflict with any other members of the Class.  Furthermore, Lead Plaintiff has retained competent counsel experienced in class action and other complex litigation.

212.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

213.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

214.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.      LOSS CAUSATION AND ECONOMIC LOSS

215.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Liberty Tax securities and operated as a fraud or deceit on Class Period purchasers of Liberty Tax securities by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed through a series of partial corrective disclosures and became apparent to the market, the price of Liberty

Tax Class A common stock declined significantly as the prior artificial inflation came out of Liberty Tax's Class A common stock price.

216.    As a result of their purchases of Liberty Tax securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities laws.

217.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company, including Hewitt's use of the Company, the Company's finances, the Company's internal controls, and the Company's supposed efforts to root out fraud and other misconduct. When the truth about Liberty Tax was revealed to the market through a series of partial corrective disclosures, the price of Liberty Tax Class A common stock fell significantly.  This decline removed the inflation from the price of Liberty Tax securities, causing real economic loss to investors who had purchased Liberty Tax securities during the Class Period.

218.    The economic loss, *i.e.* damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of Liberty Tax securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

219.    Independently, and in addition to the foregoing, Lead Plaintiff and the other Class members were directly harmed by the false and misleading statements in the DEF 14A filings alleged herein, because, among other reasons, those false and misleading statements concealed from shareholders the direct and indirect benefits Hewitt extracted from the Company, depriving shareholders of an informed vote, and allowing Defendants to continue to conceal Hewitt's reckless misconduct from investors and allowing him to continue to harm shareholders throughout

the Class Period, and thus contributing to the Company's artificially inflated stock price throughout the Class Period.

## VIII.     APPLICABILITY OF PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* ALLEGATIONS

220.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

221.    In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Liberty Tax securities was an efficient market for the following reasons, among others:

      a.  Liberty Tax Class A common stock met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient, electronic stock market;

      b.  As a regulated issuer, Liberty Tax filed periodic public reports with Nasdaq;

      c.  Liberty Tax regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.  Liberty Tax was followed by securities analysts employed by major brokerage firms, including Barrington Research, ValueEngine, BuySellSignals, and SADIF Investment Analytics, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## IX.     NO SAFE HARBOR

222.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Amended Complaint.

223.     Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Liberty Tax's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

224.     Furthermore, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Liberty Tax's Form 10-Ks and 10-Qs issued throughout the Class Period.

225.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

226.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Liberty Tax who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.      CAUSES OF ACTION

### COUNT ONE

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

227.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

228.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

229.    Defendants:

     a.  employed devices, schemes, and artifices to defraud;
     b.  made untrue statements of material fact and/or omitted to state material facts necessary to make the statements no misleading; and
     c.  engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock during the Class Period.

230.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Liberty Tax securities.  Lead Plaintiff and the Class would not have purchased Liberty Tax securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

231.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Liberty Tax securities during the Class Period.

## COUNT TWO
### Violation of Section 14(a) of the Exchange Act and
### Rules 14a-3 and 14a-9 Promulgated Thereunder
### (Against All Defendants)

232.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

233.    This count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

234.    Section 14(a) of the Exchange Act requires registrants that solicit any proxy or consent or authorization in connection with any security registered pursuant to Section 12 of the Exchange Act (other than an exempted security), to comply with such rules as the SEC may promulgate.  Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified in Schedule 14A. Rule 14a-9 prohibits, among other things, the use of proxy statements which omit to state any material fact necessary in order to make the statements therein not false or misleading.

235.    As alleged herein, during the Class Period Defendants filed and solicited proxy statements on SEC Form DEF 14A for years 2013-2017 that contained material misrepresentations and omissions in that Defendants failed to report the full amount of Defendant Hewitt's "Other Compensation," which far exceeded $10,000 per year.

236.    Throughout the Class Period, Defendants requested that Lead Plaintiff and the Class, among others, vote in person, or by proxy, on various corporate matters put to vote in the proxies.

237.    Defendants' solicited proxy statements failed to provide the requisite information concerning Hewitt's total compensation from the Company.  As a result of the foregoing, the Defendants have violated Section 14(a).

238.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages.

## COUNT THREE
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

239.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

240.    The Individual Defendants acted as controlling persons of Liberty Tax within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Liberty Tax, and their ownership of Liberty Tax securities, and in particular Defendant Hewitt's ownership of both Class A and Class B common stock, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause Liberty Tax to engage in the wrongful conduct complained of herein.

241.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.    JURY TRIAL DEMAND

242.    Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff demands a trial by jury of all of the claims asserted in this Amended Complaint so triable.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.      This action may proceed as a class action, with Lead Plaintiff as the designated Class representative and Lead Plaintiff's counsel designated as Class Counsel;

B.      Lead Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Lead Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.      Lead Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Lead Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Lead Plaintiff and members of the Class receive such other and further relief as may be just and proper.


Dated: June 12, 2018                    **COHEN MILSTEIN SELLERS & TOLL PLLC**

                                        By: */s/ Christina D. Saler*
                                        Christina D. Saler (*pro hac vice*)
                                        Three Logan Square
                                        1717 Arch Street
                                        Suite 3610
                                        Philadelphia, PA 19103
                                        Telephone: (267) 479-5700
                                        csaler@cohenmilstein.com

Steven J. Toll (*pro hac vice pending*)
Times Wang (*pro hac vice*)
Eric S. Berelovich
1100 New York Avenue, N.W., Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
twang@cohenmilstein.com
eberelovich@cohenmilstein.com

*Counsel for Lead Plaintiff*